[No. S008962. Jan. 29, 1990.]

TRAVELERS INDEMNITY COMPANY et al., Petitioners, v. ROXANI M. GILLESPIE, as Insurance Commissioner, etc., Respondent.

COUNSEL

Barger & Wolen, Kent Keller, Robert W. Hogeboom, Steven H. Weinstein and Larry M. Golub for Petitioners.

Ronald A. Zumbrun, Anthony T. Caso and Sharon L. Browne as Amici Curiae on behalf of Petitioners.

John K. Van de Kamp, Attorney General, and Randall P. Borcherding, Deputy Attorney General, for Respondent.

OPINION

KAUFMAN, J.—Subdivision (c) of Insurance Code section 1861.03 provides that notices of cancellation or nonrenewal of automobile insurance policies are effective only if based on certain stated grounds.[1] The issue presented here is whether notices of nonrenewal not based on any of these grounds are rendered ineffective by that provision (hereafter the mandatory renewal provision)[2] when the notices are sent to automobile insurance policyholders by insurers who have submitted applications to withdraw from the California insurance market, and who have surrendered their certificates of authority to the Commissioner of Insurance (Commissioner) for cancellation. We conclude that the mandatory renewal provision, which was adopted as part of the initiative measure known as Proposition 103, was not meant to apply in these circumstances and does not make such notices ineffective.

As we shall explain, the conclusion that Proposition 103's mandatory renewal provision does not apply to nonrenewal notices sent by insurers who have commenced the statutory withdrawal process is supported by the legislative intent underlying the mandatory renewal provision as construed in our recent decision in *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247] (hereafter *Calform*), by the only

---

[1] "Notwithstanding any other provision of law, a notice of cancellation or non-renewal of a policy for automobile insurance shall be effective only if it is based on one or more of the following reasons: (A) non-payment of premium; (B) fraud or material misrepresentation affecting the policy or insured; (C) a substantial increase in the hazard insured against." (Ins. Code, § 1861.03, subd. (c); all further statutory references are to the Insurance Code unless otherwise indicated.)

[2] By rendering ineffective any nonrenewal notice not based on one of the stated grounds, this provision obligates the insurer to renew an automobile policy whenever the stated grounds are absent.

pertinent out-of-state authority, and by the language and history of the preexisting statutes governing the withdrawal of insurers.

## I. *The Withdrawal Provisions*

The procedure for withdrawing as an insurer in California is prescribed by sections 1070 through 1076. Provisions governing withdrawal by insurers have been part of the Insurance Code since its enactment in 1935 (see Stats. 1935, ch. 145, §§ 1070-1074, p. 557). Although individual provisions have been amended on occasion over the intervening years, they were not amended by Proposition 103. A brief review of the statutory withdrawal procedure as set forth in these provisions will be helpful in deciding the issue before us.

Upon payment of a fee and costs, and surrender of its certificate of authority, an insurer may apply to withdraw. (§ 1070.) The application must be in writing, duly executed, and accompanied by evidence of the executing party's authority. (*Ibid.*) The Commissioner publishes the application in general circulation newspapers in San Francisco and Sacramento. (§ 1071.)

Before withdrawal is completed, the insurer must "discharge its liabilities to residents of this State"; it "shall cause the primary liabilities" under policies insuring residents of this state "to be reinsured and assumed by another admitted insurer," but it may cancel the policies, if they are subject to cancellation, "in lieu of such reinsurance and assumption." (§ 1071.5; hereafter the discharge/reinsurance provision.)[3] Before reinsuring its business, however, a withdrawing insurer must submit its reinsurance plan to the Commissioner and have the plan approved by her. (§ 1090.) The Commissioner examines the insurer's books and records and if the insurer has no outstanding liabilities to residents of this state and no uncancelled policies the primary liabilities of which have not been reinsured and assumed by another admitted insurer, the Commissioner cancels the certificate of authority and the insurer is permitted to withdraw.[4] (§ 1072.) The Commis-

---

[3] "Every insurer which withdraws as an insurer, or is required to withdraw as an insurer, from this State shall, prior to such withdrawal, discharge its liabilities to residents of this State. In the case of its policies insuring residents of this State it shall cause the primary liabilities under such policies to be reinsured and assumed by another admitted insurer. In the case of such policies as are subject to cancellation by the insurer, it may cancel such policies pursuant to the terms thereof in lieu of such reinsurance and assumption." (§ 1071.5.)

[4] While cancellation of the certificate of authority generally occurs at the end of the withdrawal process, it may occur before its commencement. Section 1070.5 provides that whenever an insurer's certificate of authority is cancelled or revoked, or an admitted insurer ceases doing an insurance business in this state for any reason, the insurer "shall apply to withdraw as an insurer and shall withdraw as such insurer from this state pursuant to this article."

sioner has discretion to waive any of these requirements (including the requirements of the discharge/reinsurance provision) if, after examining its books and records, the Commissioner finds the insurer to be in a solvent condition. (*Ibid.*) The withdrawal procedure is completed by publication of a notice of cancellation. (§ 1073.)

## II. *Facts and Proceedings*

On November 7, 1988, the day preceding the election at which Proposition 103 was adopted, five related insurance companies—The Travelers Indemnity Company, The Charter Oak Fire Insurance Company, The Travelers Indemnity Company of America, The Travelers Indemnity Company of Rhode Island, and The Phoenix Insurance Company—together sent the Department of Insurance (Department) a packet of documents intended to constitute their applications to withdraw as insurers in this state. The documents included each insurer's certificate of authority, surrendered for cancellation, and an application to withdraw accompanied by a certificate attesting that each application was signed by the applicant's executive vice president. A check in the amount of $2,950, or $590 per applicant, was submitted to cover the statutory filing fees for withdrawal applications. (See § 1076.)

Each insurer stated in its application that it had entered into a contract with The Travelers Indemnity Company of Illinois in which the latter "agreed to assume all of the liabilities, losses, and obligations of [the applicant] under those insurance policies issued to residents of the State of California, which by the terms thereof are not cancelable or subject to non-renewal."[5] Each applicant also stated it would satisfy its liabilities, losses and obligations under all other policies issued to residents of this state. A cover letter stated that the applications were conditioned upon the passage of Proposition 103 and that the applicants reserved the right to withdraw the applications if Proposition 103 did not become law or was declared invalid in whole or in part.[6]

On the same day, November 7, the applicants orally notified the Department of their intention, in conjunction with the applications for withdrawal, not to renew any of their private passenger automobile insurance policies.

---

[5] The reference to policies which "*by the terms thereof* are not cancelable or subject to non-renewal" (italics added) was evidently intended to exclude automobile policies since restrictions on automobile policy cancellations and nonrenewals are statutory and rarely, if ever, contractual. Thus, the applicants were not representing that they had reinsured their automobile policies.

[6] Although our decision in *Calfarm, supra,* 48 Cal.3d 805, held parts of Proposition 103 invalid, the applicants (with the exception, as explained *post,* of Travelers Indemnity Company of Rhode Island) have not attempted to withdraw their applications.

On November 8, 1988, the voters enacted Proposition 103, which therefore became effective the following day.[7] Among the provisions of Proposition 103 was the mandatory renewal provision (see fn. 1, *ante*). On November 9, 1988, the applicants began issuing notices of nonrenewal to their California automobile insurance policyholders on a blanket basis, without regard to the existence of the grounds stated in the mandatory renewal provision.

On November 17, 1988, the applicants sent the Department a letter outlining their proposed plan of withdrawal. In the letter, the applicants stated they intended "to run off[8] all the business, including automobile, with the exception that group disability business will be reinsured and assumed by The Travelers Insurance Company." The applicants requested that the Commissioner examine their books and records to confirm their solvency, waive the requirements of the discharge/reinsurance provision in regard to unexpired automobile policies, and cancel their certificates of authority. Attached to this letter was a copy of a form letter being used by the applicants to notify automobile insurance policyholders that their policies would not be renewed.

On November 29, 1988, the Department sent the applicants a letter acknowledging receipt of the withdrawal application packet and the letter of November 17. The Department advised the applicants that the fee for a withdrawal application had been increased from $590 to $787 per applicant,[9] and that the amount tendered by applicants was therefore deficient by a total of $985. The letter further stated that the Department would require certain additional documents before it could process the applications. The Department asserted, however, that there was "a *prima facie* fatal legal defect common to all five applications," that "no withdrawal would be permissible if the insurer intended, after withdrawal, to continue doing acts which constitute transacting insurance," and that the applicants therefore "should not seek to withdraw as long as they have insurance business with California policyholders on their books." The Department explained that a waiver of the reinsurance and assumption requirement, as requested by the applicants, would "exceed the Commissioner's discretion" because it would result in the illegal transaction of business by a nonadmitted insurer and, further, that it would "leave California policyholders with no avenue of

---

[7]Pursuant to a stay issued by this court in *Calfarm, supra,* 48 Cal.3d 805, all provisions of Proposition 103, including the mandatory renewal provision, were stayed between November 10 and December 7 of 1988.

[8]In this context, the term "run off" apparently refers to the orderly termination of existing policies over a period of time by cancellation and/or nonrenewal.

[9]Subject to certain restrictions not relevant here, section 12978 gives the Commissioner authority to increase or decrease any of the fees set forth in the Insurance Code.

administrative recourse to enforce performance of their insurance contracts" and the Department "would have no effective means to directly monitor [the applicants'] continuing solvency in the future while the California business remained in force."

Applicants responded by letter dated December 8, 1988. Enclosed with the letter was a check for $985 to cover the balance of the statutory filing fees. The letter contained an analysis of the legislative history of the withdrawal statutes (§ 1070 et seq.) and an argument that section 1072 "contemplates the authorization by the Commissioner of an insurer handling run-off business while concurrently withdrawing from the state."

On December 12, 1988, following discussions with Department representatives, applicants notified the Department in writing that one of them, The Travelers Indemnity Company of Rhode Island (Travelers Rhode Island), wanted to withdraw its application. The remaining applicants (hereafter petitioners) reaffirmed their intent to withdraw and proposed two alternative plans to satisfy the statutory requirements for withdrawal. Under the first plan, petitioners would issue notices of nonrenewal on all their private passenger automobile policies, after which they would enter into reinsurance and assumption agreements with Travelers Rhode Island or another insurer acceptable to the Commissioner. Under this first plan, the Commissioner would cancel petitioners' certificates of authority immediately upon execution of the reinsurance and assumption agreements. Under the second plan, petitioners would immediately enter into reinsurance and assumption agreements with Travelers Rhode Island, or another acceptable insurer, covering all policies *except* private passenger automobile policies, and would issue notices of nonrenewal at an appropriate time before the anniversary date of each policy. Thereafter, on December 31, 1989, all remaining business of petitioners would be reinsured and assumed by Travelers Rhode Island or another acceptable company, at which time the Commissioner would cancel petitioners' certificates of authority. Petitioners submitted that both plans satisfied all legal requirements for withdrawal and, accordingly, that neither required a waiver by the Commissioner of the requirements of the discharge/ reinsurance provision. Petitioners requested that the Department indicate which plan was acceptable to the Commissioner.

On December 23, 1988, the Department served petitioners with notices of noncompliance pursuant to section 1858.1 alleging that the nonrenewal notices they had issued after the effective date of Proposition 103 violated the mandatory renewal provision, and stating that unless petitioners presented proof of correction of the noncompliance or other response to the Commissioner within 10 days, the Commissioner would set a public hearing

at the conclusion of which the Commissioner, if she found the alleged violations existed, could issue an order for payment of money penalties and such other corrective action as she might deem appropriate.

On the same day, December 23, petitioners responded to the Department by letter, observing that the issues presented by the notice of noncompliance were matters of great public importance, agreeing to a public hearing, waiving the normal time requirements, and requesting that the hearing be held on December 29. The Commissioner set the hearing for January 4, 1989, and it was held on that date.

The hearing officer at the administrative hearing was the Department's chief counsel, who announced at the outset that after the hearing he would "take the matter under submission and in due course render his decision." The Department rested its case on exhibits and a stipulation establishing the following facts: (1) on November 7, 1988, petitioners announced that in conjunction with applications for withdrawal from the California insurance market they would issues notices of nonrenewal for all their policies of private passenger automobile insurance, (2) petitioners began to issue the nonrenewal notices pursuant to this announced intention on or about November 9, 1988, (3) the Commissioner issued a notice of noncompliance on December 23, 1988, alleging that the nonrenewal notices violated the mandatory renewal provision, and (4) petitioners made a timely response to the notice of noncompliance as required by section 1858.1. It was also stipulated that on the hearing date petitioners had approximately 22,000 private passenger automobile policies in force in California.

The Department objected to exhibits offered by the petitioners relating to their applications to withdraw from the California insurance market and their subsequent correspondence with the Department. The Department argued that the exhibits were not relevant, stating: "This proceeding is a very narrowly drawn one dealing specifically with the issue of the Notices of Nonrenewal[,] and the intimacies [*sic*: intricacies?] of the withdrawal application and the correspondence back and forth with regard to that process, are not relevant to this proceeding. [¶] *The department has acknowledged in its Notice of Noncompliance that [petitioners] have made applications for withdrawal.*" (Italics added.)[10] The hearing officer overruled the objection and admitted all exhibits offered by petitioners, observing that he might later disregard the exhibits if he found them lacking in relevance.

---

[10] *In this court the Commissioner has argued that petitioners' applications were defective for various reasons, including failure to use the Department's official application form. This argument is unavailing in view of the Department's admission at the hearing, as shown by the italicized language, that petitioners did have withdrawal applications pending.

Petitioners argued that the nonrenewal notices they issued did not violate the mandatory renewal provision for two reasons: (1) the mandatory renewal provision applied only to policies issued or renewed on or after the effective date of Proposition 103, and (2) the mandatory renewal provision did not apply to insurers who had submitted applications to withdraw from the California insurance market and tendered their certificates of authority for cancellation. The Department argued, to the contrary, that the mandatory renewal provision applied to all policies in force on or after the effective date of Proposition 103, whether or not the insurer had commenced the statutory withdrawal process. At the conclusion of the hearing a schedule was established for submission of written briefs by the parties.

After all written briefs had been submitted, the Commissioner issued her decision, which recited that she had "reviewed and considered all the evidence and entire record in these proceedings, together with the briefs and a decision by the designated hearing officer . . . ." The Commissioner determined that the mandatory renewal provision applied to all policies in force on the effective date of Proposition 103, regardless of any steps an insurer may have taken to withdraw from the California insurance market and, accordingly, that petitioners had violated the mandatory renewal provision by issuing notices of nonrenewal on a blanket basis. The Commissioner conceded, however, that a withdrawing insurer would eventually be released from the renewal obligation: "Prior to withdrawal the insurer must renew automobile policies as required by [the mandatory renewal provision], *but that obligation is among those discharged by reinsurance and assumption, and ceases when the withdrawal becomes formally effective.*" (Italics added.) Petitioners were ordered to renew all automobile insurance policies, and to rescind all notices of nonrenewal previously issued, unless valid grounds for cancellation or nonrenewal existed pursuant to the mandatory renewal provision. A penalty of $10,000 was provided for each day each petitioner failed to comply with these directives after the order's effective date.

After receiving the Commissioner's decision, petitioners requested that she disclose the decision of the hearing officer but the Commissioner has declined to do so.

Petitioners sought review of the Commissioner's decision by petitioning this court for a writ of mandate (§ 1858.6; Code Civ. Proc., § 1094.5). The petition raises three issues: (1) whether the mandatory renewal provision applies to all policies in force on November 9, 1988, or only to policies thereafter issued or renewed; (2) whether the mandatory renewal provision applies to insurers who have submitted applications to withdraw as insurers in California and have tendered their certificates of authority for cancella-

tion; and (3) whether the Commissioner is required to disclose the hearing officer's decision. Because the petition raised issues of importance and urgency relating to those then before us in *Calfarm, supra,* 48 Cal.3d 805, we assumed original jurisdiction and issued an alternative writ.

### III. *The Mandatory Renewal Provision Applies to All Policies in Force on the Effective Date of Proposition 103*

■ Petitioners contended in their mandate petition that the mandatory renewal provision applies only to policies issued or renewed on or after the provision's effective date. As petitioners now acknowledge, this issue was subsequently decided against them in *Calfarm, supra,* 48 Cal.3d 805, 826-831, in which we concluded that the mandatory renewal provision was intended to and does apply to all policies in force when the measure took effect, and that this application to preexisting policies does not violate the state or federal Constitution.

### IV. *The Mandatory Renewal Provision Does Not Apply to Insurers Withdrawing From the California Market*

We emphasize at this juncture that the decision under review is a decision by the Commissioner on notices of noncompliance pursuant to section 1858.1 charging petitioners with violation of the mandatory renewal provision. This point deserves mention because the Commissioner argues in her brief on the merits that "[t]here are no grounds for this Court to compel the Commissioner to permit petitioners to withdraw because consideration and approval of withdrawal is premature." We agree that the question whether petitioners are presently entitled to have their withdrawal applications approved is not now before us and, indeed, petitioners have not contended otherwise. They do not contend in this proceeding that they have a present right to approval of their withdrawal applications, but only that they have a present right not to renew automobile policies. The status of their withdrawal applications is relevant only insofar as it bears on the effectiveness of the notices of nonrenewal they issued.

We do, however, take issue with the Commissioner's characterization of the withdrawal process in her decision as "lengthy and detailed." We find nothing in the language of the withdrawal statutes suggesting that in the normal case the withdrawal process is to be other than simple and expeditious. Although section 1072 requires the Commissioner to examine the insurer's books and records, she is to do so only to determine whether the insurer has outstanding liabilities to residents of this state or uncancelled policies the primary liabilities of which have not been reinsured and assumed by another admitted insurer. An inquiry into the withdrawing insur-

er's financial condition and solvency is required only if the insurer has requested a waiver of the normal withdrawal requirements. If the insurer has met the statutory conditions for withdrawal (and therefore does not request a waiver), the Commissioner has no discretionary authority to deny the withdrawal application.

■ As we have noted, the statutory provisions governing withdrawal of insurers were enacted long before the advent of Proposition 103 and its mandatory renewal provision. Of particular significance here is the discharge/reinsurance provision, which states that when an insurer applies to withdraw, it "shall cause the primary liabilities under such policies to be reinsured and assumed by another admitted insurer" but that "in lieu of such reinsurance and assumption" the insurer may cancel "such policies as are subject to cancellation."

The mandatory renewal provision was added in 1988 by Proposition 103, an initiative measure making numerous fundamental changes in the system by which various forms of insurance, including automobile insurance, are regulated in this state. It provides that a notice of cancellation[11] or nonrenewal of a policy of automobile insurance shall be effective only if based on certain specified grounds. (See fn. 1, *ante*.) The mandatory renewal provision does not refer to the withdrawal statutes, nor does Proposition 103 in any way purport to alter or amend those statutes.

*The Calfarm Opinion.* In *Calfarm, supra,* 48 Cal.3d 805, we considered challenges to various provisions of Proposition 103, including the mandatory renewal provision. In reaching the conclusion that the mandatory renewal provision could constitutionally be applied to policies in force on its effective date, we relied in part on the ability of insurers adversely affected by the provision to quit the California market: "Proposition 103 does not prevent an insurer from discontinuing its California business. Sections 1070 through 1076 spell out the procedure by which an insurer may withdraw from California by surrendering its certificate of authority. The initiative did not repeal those sections, and indeed recognizes the possibility that insurers may withdraw from some insurance markets by authorizing the commissioner to establish a joint underwriting authority to serve such markets." (*Calfarm, supra,* 48 Cal.3d 805, 831.)

That language plainly implied that the mandatory renewal provision does not apply to insurers who employ the statutory procedure for withdrawing

---

[11] As we observed in *Calfarm, supra,* 48 Cal.3d 805, "Insurers' power to cancel [automobile] policies was severely restricted by section 661 before enactment of Proposition 103." (At p. 826, fn. 19.) The mandatory renewal provision extended to automobile policy nonrenewals the restrictions previously imposed only on cancellations. The provision's only effect on cancellations was to "eliminate the 60-day grace period following issuance of a policy during which section 661 placed no limits on cancellation." (*Ibid.*)

from the California insurance market. An insurer's business consists of its policies in force and these may be "discontinued" only by cancellation or expiration. An insurer who is precluded from cancelling and is required to renew its automobile policies cannot discontinue its California business. To state that Proposition 103 does not prevent an insurer from discontinuing its California business, therefore, is to state that Proposition 103's mandatory renewal provision does not apply to insurers who elect to withdraw from the California insurance market by following the statutory withdrawal procedures. We reconsider this same issue here in greater depth, and reach the same conclusion.

*Proposition 103.* As we noted in *Calfarm, supra,* 48 Cal.3d 805, 831, Proposition 103 contemplates the possibility of insurers terminating their California business by withdrawal from the automobile insurance market. Proposition 103 added section 1861.11,[12] authorizing the Commissioner to establish a joint underwriting authority upon finding that "insurers have substantially withdrawn from any insurance market covered by this article, including insurance described by Section 660 [automobile insurance]." The clear implication of this provision is that withdrawal—a term most often referring to an insurer's complete discontinuance of business in a state—will result in a lapse of coverage for some automobile insurance policyholders. Since no lapse of coverage would occur if insurers remained bound by the mandatory renewal provision during and after the statutory withdrawal process, it necessarily follows that the mandatory renewal provision was not meant to affect insurers who employ the statutory withdrawal procedure. (See *Calfarm, supra,* at pp. 827, fn. 21, 831.)

*Other Jurisdictions.* We are aware of only one other judicial decision that has addressed the issue whether a statute restricting an insurer's ability not to renew insurance policies applies to a withdrawing insurer. In that case, *People* ex rel. *Lewis* v. *Safeco* (1978) 98 Misc.2d 856 [414 N.Y.S.2d 823], two insurers who had experienced business losses in New York attempted to surrender their New York licenses. The Superintendent of Insurance advised them they did not have the right to surrender or not renew their licenses as they were obligated by statute to renew automobile insurance policies. As the court observed, "the Superintendent's interpretation creates an unreasonable 'Catch 22', which would prevent any insurer from ever terminating its business in this State in spite of the fact that there is no

---

[12] "In the event that the commissioner finds that (a) insurers have substantially withdrawn from any insurance market covered by this article, including insurance described by Section 660 [automobile insurance], and (b) a market assistance plan would not be sufficient to make insurance available, the commissioner shall establish a joint underwriting authority in the manner set forth by Section 11891, without the prior creation of a market assistance plan." (§ 1861.11.)

express legislative policy warranting such a drastic result." (98 Misc.2d at p. 863 [414 N.Y.S.2d at p. 827].) The court concluded that the automatic renewal law did not apply to withdrawing insurers, and that the insurers had the right to terminate their business by an orderly phase-out of existing policies. (See also *Sheeran* v. *Nationwide Mut. Ins. Co., Inc.* (1979) 80 N.J. 548 [404 A.2d 625, 630-631].)

*The Withdrawal Statutes.* The Commissioner argues that under California law an insurer's withdrawal is governed by statute, and that under the statutory procedure the "Catch 22" situation which concerned the New York court simply does not arise. The Commissioner's argument, as we understand it, is that the withdrawal statutes provide a mechanism—the reinsurance and assumption agreement—whereby a withdrawing insurer can be released from its obligations to automobile policyholders in this state while at the same time providing continuation of coverage for the withdrawing insurer's policyholders through the reinsurer. The Commissioner thus apparently views the reinsurance and assumption agreement as a means by which the withdrawing insurer can transfer its policy obligations to another insurer and be completely and finally released from them. According to this view, the reinsurer steps into the shoes of the withdrawing insurer, assuming all policy obligations—both contractual and statutory—and the withdrawing insurer, having stepped out of its shoes, is fully and finally released from those same obligations.

■ If this is indeed the Commissioner's argument, it is based on a completely mistaken understanding of the purpose and effect of reinsurance and assumption agreements. Execution of such an agreement does not in any way release the original insurer from its policy obligations; rather, it results in both the original insurer and the assuming insurer being obligated to the insured.

A reinsurance contract is "one by which an insurer procures a third person to insure him [i.e., the insurer] against loss or liability by reason of such original insurance." (§ 620.) If the agreement is purely for reinsurance, it benefits only the insurer; the original insured has no interest in it (§ 623) and acquires no rights under it. (See *Ascherman* v. *General Reinsurance Corp.* (1986) 183 Cal.App.3d 307, 311-312 [228 Cal.Rptr. 1].) Such an agreement clearly cannot operate to relieve the original insurer of any obligation to the insured.

A contract by which a reinsurer *assumes* the policies of the original insurer does result in the reinsurer being directly liable to the original insureds (*Sawyer* v. *Sunset Mutual Life Ins. Co.* (1937) 8 Cal.2d 492, 496 [66 P.2d 641]), but it does not release the original insurer, which remains

jointly obligated with the reinsurer (*id.* at p. 499; *Baer* v. *Associated Life Ins. Co.* (1988) 202 Cal.App.3d 117, 123 [248 Cal.Rptr. 236]). Indeed, the original insurer cannot be released by any agreement with another insurer, absent the consent of the insured. (See Civ. Code, § 1457 ["The burden of an obligation may be transferred with the consent of the party entitled to its benefit, but not otherwise . . . ."]; see also *Columbia Cas. Co.* v. *Industrial Acc. Com.* (1936) 5 Cal.2d 770, 778-779 [56 P.2d 527].)

Legislative history submitted by the Commissioner shows that the discharge/reinsurance provision was never intended to provide a mechanism for releasing withdrawing insurers from policy obligations. The Commissioner has provided us with two letters sent to then-Governor Earl Warren concerning the legislation (i.e., Stats. 1945, ch. 1041, § 2, pp. 2030-2031) by which the discharge/reinsurance provision was enacted. These letters, of which we take judicial notice, indicate that this provision was enacted in response to the case of *People* v. *Alliance Life Ins. Co.* (1944) 65 Cal.App.2d 808 [151 P.2d 868], and that its purpose was to protect California residents by requiring that any insurer withdrawing from the California insurance market follow the statutory withdrawal procedure, so that the primary liabilities of any unexpired and uncancelled policies will be reinsured and assumed by another admitted insurer.[13] (See also 17 Ops.Cal.Atty.Gen. 28.) Nothing in the letters or in the discharge/reinsurance provision itself suggests an intent to bar any of the policyholders' remedies against the original insurer or to release the original insurer from any of its policy obligations.

The Commissioner may be understood to make a somewhat different argument,[14] as follows. The effect of execution of the reinsurance and assumption agreement is that the reinsurer and the original insurer are jointly obligated to the automobile insurance policyholder. These joint obligations, so the argument runs, include not only contractual duties but also the statutory duty to renew automobile policies in accordance with the mandatory renewal provision. Once the original insurer completes the statutory withdrawal process, however, and its certificate of authority has been cancelled by the Commissioner, it no longer is required to renew automobile policies, but the renewal obligation, according to this argument, continues to be enforceable against the reinsurer.

---

[13] California residents are also protected by sections 1610-1611, which provide that certain actions by a nonadmitted insurer in connection with policies issued to California residents, including the collection of premiums, constitute the insurer's appointment of the Commissioner as its agent for accepting service of process.

[14] In a portion of her decision previously quoted, the Commissioner stated that the renewal obligation "is among those discharged by reinsurance and assumption, and ceases when the withdrawal becomes formally effective." From this statement it is unclear whether it is the reinsurance agreement or completion of the withdrawal process that, in the Commissioner's view, results in the transfer of the renewal obligation to the reinsurer.

We observe at the outset that this argument concedes the principal conclusion we reach in this section of the opinion, which is that the mandatory renewal provision was not meant to and does not apply to insurers who withdraw from the California insurance market by following the statutory withdrawal procedure. If the argument were valid, however, it would mean that an insurer with automobile policies in force could withdraw only by procuring another insurer willing to assume its automobile policies, not merely for the balance of their terms, but for the indefinite future. For a multitude of reasons, we conclude that the argument is not valid.

The discharge/reinsurance provision requires only that a withdrawing insurer with policies insuring residents of this state "cause the primary liabilities under such policies to be reinsured and assumed by another admitted insurer." While the term "primary liabilities under such policies" is not defined, it cannot reasonably be construed to include a statutory renewal obligation. Moreover, as applied to policies of automobile insurance "renewal" means "to continue coverage with either the insurer which issued the policy or an affiliated insurer . . . for an additional policy period upon expiration of the current policy period of a policy . . . . " (§ 660, subd. (e).) Thus any continued coverage under an automobile policy by an insurer other than the original insurer or its affiliates is not a "renewal." Clearly, a reinsurer cannot be obligated to do what it is by definition incapable of doing, i.e., "renewing" automobile policies issued by another insurer.[15] And, finally, if the mandatory renewal provision does not apply to an insurer after its certificate of authority is cancelled, a notice of nonrenewal sent by the original insurer after cancellation of its certificate would be effective and would result in final expiration of the policies without the necessity of any action by the reinsurer.

The Commissioner's reasoning, under either of these arguments, is inconsistent with our previous interpretation of section 1861.11 (see fn. 12, *ante*), which permits the Commissioner to establish a joint underwriting authority whenever insurers have substantially withdrawn from an insurance market. As noted, we construed this provision in *Calfarm, supra,* 48 Cal.3d 805, as evidence that the result of the statutory withdrawal process would be a lapse of coverage for some California automobile policyholders and thus as evidence that nothing in Proposition 103 prevents an insurer from "discontinuing" its California business. The Commissioner's argument, on the other hand, assumes that withdrawing insurers can wind up their affairs and obtain release from all automobile policy obligations while at the same time requiring the automobile policies they have written to be renewed in perpe-

---

[15] Although an affiliate of the original insurer can "renew" its policies, it would be unreasonable to construe the discharge/reinsurance provision as requiring reinsurance with an affiliate since insurers lacking affiliates admitted in California could never comply.

tuity by another insurer pursuant to a reinsurance and assumption agreement. Correctly understanding that this was simply impossible, the drafters of Proposition 103 anticipated that resort to the statutory withdrawal procedure would inevitably result in loss of coverage for some California policyholders, and they provided the Commissioner with powers appropriate to deal with this inevitable result.[16]

■ Since, as we recognized in *Calfarm, supra,* 48 Cal.3d 805, 831, Proposition 103 does not prevent an insurer from discontinuing its California business, and since nonrenewal and cancellation are the only methods by which a withdrawing insurer can terminate its existing automobile policies, the conclusion is inescapable that the mandatory renewal provision does not apply to insurers who withdraw from the California market by use of the statutory withdrawal procedures. Nothing in the withdrawal statutes is inconsistent with this conclusion. Indeed, the withdrawal statutes manifest a legislative intent that insurers electing to withdraw be permitted to wind up their affairs and leave the state in an orderly and expeditious manner.

V. *The Mandatory Renewal Provision Does Not Apply to an Insurer Who Has Complied With Statutory Requirements for a Withdrawal Application*

■ The Commissioner argues that even if, as we have concluded, the mandatory renewal provision does not apply to insurers who withdraw by following the statutory withdrawal procedure, the provision applies throughout the withdrawal process and it is only upon approval of the withdrawal application and cancellation of the insurer's certificate of authority that the renewal obligation no longer applies.

The Commissioner's argument rests on a mistaken understanding of the withdrawal process. The Commissioner appears to argue that because an insurer remains an admitted insurer until its certificate is cancelled, an insurer applying to withdraw must therefore be subject to all our state laws governing insurers, including the mandatory renewal provision. Conversely, the Commissioner apparently assumes that because an insurer becomes a nonadmitted insurer upon cancellation of its certificate, the insurer cannot thereafter service any remaining policies.

---

[16] In *Calfarm* we observed that the evident purpose of the mandatory renewal provision was "to give policyholders *a measure of assurance* that their coverage would continue, and to prevent widespread refusals to renew in response to the initiative's enactment." (*Calfarm, supra,* 48 Cal.3d 805, 827, italics added.) In stating that the provision gave policyholders "a measure of assurance" we recognized that it was not intended to provide, and does not provide, complete or absolute protection against termination of coverage by the insurer's failure to renew.

If the Commissioner's understanding were accurate, it is difficult to see how an insurer with automobile policies in force could ever leave the state. Notices of nonrenewal issued before cancellation of the insurer's certificate would be ineffective under the mandatory renewal provision, but an insurer could not withdraw with automobile policies in force because any action taken to service those policies after withdrawal, including presumably the sending of nonrenewal notices, would constitute the illegal transaction of insurance business by a nonadmitted insurer. As we explain, the Commissioner's assumptions are fundamentally erroneous.

First, the provision authorizing the Commissioner to waive the requirements of the discharge/reinsurance provision necessarily contemplates that solvent insurers in appropriate cases may withdraw with policies in force— policies not reinsured and assumed by another admitted insurer—and thus that these insurers can validly service their policies after cancellation of their certificates. This conclusion is reinforced by section 1070.5, which requires an insurer to submit a withdrawal application if its certificate of authority has been revoked or cancelled. Clearly it would be anomalous to hold that cancellation or revocation of an insurer's certificate as a sanction, before the withdrawal process even commenced, relieved an insurer from the obligation of servicing its existing policies.

Moreover, an insurer's status as admitted or nonadmitted[17] is not the universal litmus test the Commissioner apparently supposes it to be. Some provisions of the Insurance Code apply only to nonadmitted insurers (e.g., § 700, subd. (b) [unlawful transaction of insurance business]), some apply to admitted and nonadmitted insurers alike (e.g., §§ 250-287 [insurable events and interests], 331 [concealment entitles injured party to rescind insurance], 352 [rules of interpretation for policies]), and there are also provisions that apply to some admitted insurers but not others (§§ 1100.1 ["Every admitted incorporated insurer . . . . "], 1150 [same], 1210 ["Any domestic incorporated insurer . . . . "], 1211.5 ["Any domestic incorporated life insurer . . . . "]). Accordingly, whether a statute regulating the business of insurance applies to an insurer or to a policy in a given case is not determined exclusively by asking whether the insurer is admitted or nonadmitted. ■ Rather, as with any statute, the scope of a provision governing

---

[17] An insurer is admitted if it is "entitled to transact insurance business in this State, having complied with the laws imposing conditions precedent to transaction of such business" (§ 24), and nonadmitted if it is "not entitled to transact insurance business in this State, whether by reason of failure to comply with conditions precedent thereto, or by reason of inability so to comply" (§ 25). An insurer may be admitted to transact some classes of insurance but not others. (See § 700, subd. (a) [An insurer "shall not transact any class of insurance business in this state without first being admitted for such class."].) Certain provisions are expressly limited to admitted insurers (see, e.g., §§ 679.71 ["No admitted insurer . . . ."], 997, subd. (c) ["Every admitted insurer . . . . "]).

insurance should be determined with reference to the whole system of law of which it is a part so that all may be harmonized and have effect. (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 489 [134 Cal.Rptr. 630, 556 P.2d 1081]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) ██ When so viewed, the most reasonable interpretation of the applicable statutes is that once the withdrawal process has been properly commenced by compliance with the statutory withdrawal application requirements, including the surrender of the insurer's certificate to the Commissioner for cancellation, the applicant has the particular status of a withdrawing insurer and may terminate its outstanding automobile policies by nonrenewal.

As we have observed, the withdrawal statutes were in effect long before enactment of Proposition 103 and were not modified by it. Before the effective date of the mandatory renewal provision, an insurer seeking to withdraw from the California market could run off its automobile business by cancelling those policies subject to cancellation and by issuing notices of nonrenewal on the remaining automobile policies and allowing them to expire. The insurer could do this either before making application to withdraw or while its withdrawal application was pending. Having in this manner terminated its automobile policies, the remaining liabilities to be reinsured would be relatively few and the Commissioner's task in determining what liabilities remained outstanding would be relatively light.

Proposition 103, as already pointed out, left the going-out-of-business provisions intact and an intent to fundamentally alter the withdrawal process cannot reasonably be implied. But that would be precisely the result if a withdrawing insurer were required to renew automobile policies while its withdrawal application was pending. The liabilities it would be required to reinsure would be not merely those remaining after termination of its automobile policies, but all its automobile policies in force and each future policy resulting from compelled renewal during the pendency of its withdrawal application. Finding a reinsurer willing to assume such a large and relatively ill-defined bundle of present and future liabilities, particularly in the uncertain insurance market which followed enactment of Proposition 103, would be no simple matter. The burden on the Commissioner to determine the extent of the insurer's outstanding liabilities, and whether all had been reinsured, would be similarly increased. Nothing in the language of Proposition 103 suggests the voters intended to impose these substantially increased burdens on the Commissioner and on the withdrawing insurers. Because renewal of automobile policies is fundamentally inconsistent with the act of withdrawing and would greatly burden and complicate the withdrawal process, and because the Commissioner has adequate powers to protect the rights of California residents during the winding-up process

contemplated by the statutory withdrawal provisions, it is most reasonable to conclude that the mandatory renewal provision was not meant to preclude an insurer from terminating its automobile policies by nonrenewal during the withdrawal process.

The statutory requirements for an application to withdraw as an insurer are (1) surrender of the certificate of authority for cancellation, (2) payment of the statutory application fee, (3) submission of a written and duly executed withdrawal application, and (4) submission of evidence that the party who executed the application had authority to do so. (§ 1070.) Here petitioners submitted evidence to establish compliance with each of these requirements and, as noted (see fn. 10, *ante*) the Department expressly acknowledged at the administrative hearing that petitioners have made applications for withdrawal. As we shall explain, compliance with these statutory requirements marks the commencement of the withdrawal process.

The withdrawing insurer's act of surrendering the certificate of authority for cancellation is not purely symbolic, nor is it merely so that the certificate will be conveniently at hand when the time comes for its cancellation. Rather, the act of surrender effects a change in the insurer's status. In this regard, an analogy may be drawn to a voluntary proceeding for winding up a corporation. The proceeding commences with the adoption of a resolution of the shareholders or directors electing to wind up and dissolve (Corp. Code, § 1900), after which a certificate of election to wind up and dissolve is filed (Corp. Code, § 1901). Once the voluntary proceeding has commenced, "the corporation shall cease to carry on business except to the extent necessary for the beneficial winding up thereof . . . . " (Corp. Code, § 1903.)

In similar fashion an insurer, by the act of surrendering its certificate for cancellation, has committed itself to the orderly winding up of its affairs in this state and may not thereafter write new business in this state while its certificate remains in the Commissioner's possession.[18] Consequently, a withdrawing insurer differs from other admitted insurers in at least one highly significant respect: it may not write new business. Given our previous conclusion that the mandatory renewal provision was not intended to and does not apply to insurers who withdraw by the statutory procedure, it is most reasonable to conclude that a withdrawing insurer—i.e., one who has surrendered its certificate of authority for cancellation and submitted a facially sufficient application to withdraw—is not required to renew automobile policies.

---

[18] While the writing of new business by a withdrawing insurer is improper, we do not imply that the resulting policies would be either void or voidable at the insurer's option. Nor do we imply that renewal pursuant to a *contractual* renewal obligation would constitute writing new business.

We perceive no basis for the Commissioner's stated concern that she would be powerless to prevent an insurer from abandoning its withdrawal application after using the nonrenewal mechanism to rid itself of its unprofitable automobile policies. As we have explained, a withdrawing insurer may not write new business and thus may not renew some automobile policies while allowing others to expire. Any such selective nonrenewal would be inconsistent with the insurer's stated intent to withdraw and would provide grounds for appropriate regulatory action by the Commissioner. Similarly, an insurer who has commenced the withdrawal process may not unilaterally terminate it and the Commissioner may condition termination of the withdrawal process on appropriate remedial action by the insurer. In short, so long as the Commissioner holds the insurer's certificate, the insurer will be precluded from writing new business and the Commissioner may impose reasonable conditions on the return of the certificate sufficient to protect California residents from any harm or loss occasioned by the insurer's actions.

## VI. *The Commissioner Need Not Disclose the Hearing Officer's Decision or Recommendation in This Case*

Petitioners maintain that the Commissioner is required by "traditional notions of fair play and substantial justice" to disclose the hearing officer's decision. Although they initially argued that the Administrative Procedure Act (Gov. Code, § 11370 et seq.) governs proceedings on a notice of noncompliance pursuant to section 1858.1, they have abandoned this argument and do not maintain that disclosure of the hearing officer's decision is required by any statute.

Nor do petitioners contend that the procedure by which the Commissioner reviewed and rejected the hearing officer's decision denied them due process of law. They do not argue, for example, that the Commissioner's review of the administrative record prepared by the hearing officer was an inadequate basis for decision (see generally, *Cooper* v. *State Bd. of Medical Examiners* (1950) 35 Cal.2d 242, 246 [217 P.2d 630, 18 A.L.R.2d 593] [personal presence of administrative decision maker at hearing not required]), or that the failure to disclose the hearing officer's decision in itself denied them due process or violated any other constitutional or statutory right.

The basic defect in petitioners' argument, apart from the absence of supporting authority, is their inability to explain what relevant and useful purpose disclosure would serve in this case. As the case was decided on documentary evidence and stipulated facts, witness credibility issues were not presented, so there is no occasion to decide whether the hearing officer's

determinations of disputed factual questions would be entitled to the "great weight" sometimes accorded to such findings by virtue of the hearing officer's opportunity to observe the witnesses' demeanor. (See, e.g., *Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 318-319 [90 Cal.Rptr. 355, 475 P.2d 451].) Similarly, there is no allegation that the Commissioner has acted arbitrarily and capriciously and thus we need not decide whether the Commissioner could be required to disclose a rejected hearing officer's decision in such a case.

Under these circumstances, the hearing officer's recommended decision, once rejected, ceased to have any legal significance in this case. (Cf. *Compton* v. *Board of Trustees* (1975) 49 Cal.App.3d 150, 158 [122 Cal.Rptr. 493] (per Kaus, P. J.) [failure to include copy of proposed decision in administrative record did not prevent running of limitations period for seeking judicial review of administrative decision].)

We recognize that disclosure of the hearing officer's decision is common practice in administrative proceedings and that giving affected parties an opportunity to review and comment on the hearing officer's decision before final action by the agency may improve the agency's decisionmaking process. As disclosure of the hearing officer's decision in a proceeding under section 1858.1 is not compelled by any recognized legal authority and would not serve any useful purpose in this case now that the Commissioner has issued her decision, we conclude petitioners have no present right to disclosure of the hearing officer's recommended decision.

VII. *Conclusion*

Because insurers have the right to discontinue their business activities in this state, and because nonrenewal of existing automobile policies is a logical and integral part of the orderly winding up of a withdrawing insurer's affairs, we have determined that Proposition 103's mandatory renewal provision does not apply to an insurer who has commenced the process of withdrawing as an insurer in this state by complying with statutory application requirements, including surrender of its certificate of authority for cancellation. Because petitioners have failed to demonstrate that the hearing officer's recommended decision, which was apparently rejected by the Commissioner, would have any utility in this case for purposes of our review of the Commissioner's decision, we have also concluded that petitioners have no present right to disclosure of the hearing officer's recommended decision in this matter.

The petition for peremptory writ of mandate is granted. Let a writ of mandate issue commanding the Commissioner to set aside her decision and

order, and to issue a new decision and order not inconsistent with this opinion.

Lucas, C. J., Panelli, J., and Eagleson, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I concur with the majority opinion insofar as it concludes that the mandatory renewal provision (Ins. Code, § 1861.03, subd. (c)) does not apply to either an insurer or a reinsurer after the Insurance Commissioner has approved an application to withdraw. Although the facts of this case concern the nonrenewal of policies by insurers before the commissioner has decided whether to approve or disapprove the applications to withdraw, the legal issue is not necessarily so limited. In my view, the legal interrelationship between the question of the statute's applicability before the commissioner's decision and the question of its applicability after the commissioner has approved an application to withdraw is sufficient to warrant addressing both issues in this case.

If one concludes that the mandatory renewal provision applies prior to the commissioner's decision, then its applicability after the commissioner's decision should also be addressed. Otherwise, uncertainties could arise as to the validity of the statute itself because its unlimited application would prevent insurers from ever discontinuing business in California. This result, in turn, could give rise to a substantial doubt regarding the provision's validity. (See *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 826-831 [258 Cal.Rptr. 161, 771 P.2d 1247].) Given the circumstances, the failure to address the legal issue of the applicability of the mandatory renewal provision after a decision by the commissioner approving a withdrawal application could perpetuate the uncertainty and "exacerbate the burdens of the litigation." (*Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247, 257 [53 Cal.Rptr. 673, 418 P.2d 265].)

I disagree with the majority opinion's conclusion that the mandatory renewal provision does not apply before a decision by the commissioner approving an application to withdraw. As to this issue, I agree fully with the views set forth in Justice Broussard's dissenting opinion.

**BROUSSARD, J.**—I dissent. Proposition 103, in Insurance Code section 1861.03, subdivision (c),[1] limits the right of an automobile insurer to refuse to renew policies. The only question directly before us is whether that section applies to an insurer who has applied for permission to withdraw, but whose application has not yet been approved by the commissioner. We should uphold the commissioner's ruling that until the insurer's application

---

[1] Unless otherwise noted, statutory citations are to the Insurance Code.

is approved and its certificate of authority cancelled, the insurer remains an insurer admitted to do business in California, and is subject to all the laws governing such insurers—including section 1861.03, subdivision (c).[2]

The majority opinion, however, does not limit itself to the narrow issue on which the commissioner's decision was based—whether an insurer is relieved of its statutory duty to renew simply by submitting an application to withdraw, *before* the commissioner has approved the application. Instead, it also addresses a distinct and much broader question: whether an insured's right to renew, with the original insurer or a reinsurer, remains in effect *after* the commissioner has approved the insurer's application. That broader question, however, was not before the commissioner and should not be decided in this proceeding. Even if we assume that Proposition 103's protection of an insured's right to renew evaporates once the commissioner has approved the insurer's application to withdraw, that assumption would not affect the validity of the commissioner's decision that the insurer may not unilaterally repudiate any of its statutory obligations before the commissioner has approved the application.

The majority contend that the voters who enacted Proposition 103 intended that an insurance company which had merely applied to withdraw from California, and had not yet received permission to do so, would be exempt from the renewal requirement of section 1861.03, subdivision (c). In advancing this assertion, the majority opinion does not rely on the language of section 1861.03, subdivision (c), since that provision contains no words suggesting that it, unlike other regulatory laws, including the rest of Proposition 103, does not apply to a company that has requested permission to withdraw. Instead, it relies on a different part of Proposition 103, section 1861.11, and on language from our decision in *Calfarm, supra,* 48 Cal.3d 805.

In *Calfarm* we observed that section 1861.11 "recognizes the possibility that insurers may withdraw from some insurance markets" (48 Cal.3d 805, 831) by authorizing the commissioner, in event of substantial withdrawals, to establish a market assistance plan or joint underwriting authority.[3] Since requiring withdrawn insurers to renew policies would reduce the need for a

---

[2] The commissioner also decided that section 1861.03, subdivision (c), applied to policies in effect when Proposition 103 was enacted. We later reached the same conclusion in *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247] (hereafter *Calfarm*).

[3] Section 1861.11 states that "[i]n the event that the commissioner finds that (a) insurers have substantially withdrawn from any insurance market covered by this article, including insurance described by Section 660 [automobile insurance], and (b) a market assistance plan would not be sufficient to make insurance available, the commissioner shall establish a joint underwriting authority . . . ."

market assistance plan or joint underwriting authority, the majority infer that the renewal provision was not intended to impose that requirement.

This argument may support the majority's assertion that when an insurer has received permission to withdraw it is no longer required to renew policies, a question which we are not required to decide today, but it undermines their assertion that a company which has merely applied to withdraw is relieved of its statutory duty to renew. Market assistance plans and joint underwriting authorities require advance planning. If the commissioner could count on a period of time between the insurer's application to withdraw and its refusal to renew policies, she could determine whether such measures are necessary to assure continued coverage and put them into effect. But if, as the majority hold, the insurer can file its application and immediately send its nonrenewal notices, both the commissioner and the policyholders can be taken by surprise, and some may be left without protection before the commissioner can act.

The basic purpose of Proposition 103, seen in the setting in which it was adopted, indicates that its renewal provision should apply during the withdrawal process. The express purpose of the initiative is to ensure that "insurance is fair, available, and affordable for all Californians." (*Calfarm, supra*, 48 Cal.3d at p. 813.) We relied on that statement of purpose in *Calfarm* to uphold the constitutionality of applying section 1861.03, subdivision (c), to existing policies. Applying the renewal provision to existing policies served an important public interest, we said, because "the drafters and the voters were evidently concerned that the enactment of Proposition 103 might cause some insurers not to renew some or all of their existing policies, an action which would undermine Proposition 103's goal of making insurance 'available' for all Californians." (*Calfarm, supra*, 48 Cal.3d at p. 831.) If one purpose of the nonrenewal provision is to protect against the danger of large-scale nonrenewals incident to the enactment of Proposition 103, that purpose is subverted by permitting insurers, upon enactment of Proposition 103, to refuse to renew policies before receiving permission to withdraw.

Yet this is exactly what the Travelers Indemnity Company (hereafter Travelers) did. The day after Proposition 103 was enacted Travelers began sending notices of nonrenewal to its policyholders. There was considerable uncertainty in the insurance market and many insurers were not accepting new customers. If the commissioner's investigation later disclosed that Travelers had not complied with the requirements of the withdrawal statutes—or if Travelers later changed its mind and decided not to withdraw, as did several other companies—Travelers' unilateral repudiation of the

renewal obligation would have left many insureds without coverage during the interim period.

Furthermore, Travelers attached two conditions to its application to withdraw. Its letter of November 7, 1988, enclosing the application to withdraw, expressly reserved the right to withdraw the application if Proposition 103 either did not become law or was declared invalid in whole or in part. Then on November 9, 1988, without waiting to see if the second condition was fulfilled, Travelers began sending notices of nonrenewal. If a company can refuse to renew policies after submitting a conditional application to withdraw, or one which reserves a right to recall the application, Proposition 103's protection against nonrenewal has a gaping hole.[4]

But the pernicious effect of the majority position is not limited to its effect on persons insured by Travelers or other companies which sought to withdraw from California immediately after the enactment of Proposition 103. As of the date of this opinion, more than one year later, the Insurance Commissioner still has not fixed rates under that measure. When she does so, according to the majority, there is nothing to prevent an insurer, or many insurers, from filing an application to withdraw from California, and immediately sending their policyholders a notice of nonrenewal. Indeed, there is nothing to prevent a company today from submitting an application to withdraw while reserving the right to recall that application if it is satisfied with future rate decisions, and then sending its nonrenewal notices without waiting for that rate decision. Thus, the majority's construction of section 1861.03, subdivision (c), diminishes the assurance of continued coverage which Proposition 103 was intended to provide (see *Calfarm, supra,* 48 Cal.3d 805, 827) and leaves policyholders constantly vulnerable to the threat of nonrenewal.

The majority also rely on our statement in *Calfarm* that "Proposition 103 does not prevent an insurer from discontinuing its California business."[5] (48 Cal.3d 805, 831.) An insurer "discontinues" its business, they reason, by cancelling policies or letting them expire, so an insurer required to renew policies cannot "discontinue" its California business. They conclude that therefore Proposition 103 does not require a withdrawing insurer to renew policies.

But this reasoning says nothing about whether an insurer can refuse to renew policies when it has applied to withdraw, or must wait until it has

---

[4] I question whether a conditional application complies with section 1070. That question can be determined when the commissioner decides whether to approve Travelers' application.

[5] In context, all the quoted statement meant was that Proposition 103 does not prevent an insurer from discontinuing its California business, i.e., withdrawing from the California market, by following the procedures set out in sections 1070 through 1076.

received the commissioner's approval and can actually begin the process of withdrawing. On that point the key language from *Calfarm* is that which acknowledges that section 1861.03, subdivision (c), was "designed to give policyholders a measure of assurance that their coverage would continue, and to prevent widespread refusals to renew in response to the initiative's enactment." (48 Cal.3d 805, 827.) Recognizing that this purpose obviously would not be served by permitting a company to obtain an exemption from the statutory requirement simply by filing an application to withdraw, the majority can only respond that by "a measure of assurance" we did not mean "complete or absolute protection." (Maj. opn., *ante*, at p. 98, fn. 16.) But surely between an interpretation of section 1861.03, subdivision (c) which extends greater protection, and one which deprives the policyholder of that protection, both the purpose of Proposition 103 and the tenor of our opinion in *Calfarm* require the more expansive interpretation.

The majority, however, go on to claim not only that Proposition 103 does not prevent a company from discontinuing its California business, which is what we said in *Calfarm*, but that it does not fundamentally alter the way in which it discontinues that business. But that assertion is clearly incorrect, as the majority opinion demonstrates.

Before Proposition 103, an insurer could "run off" its automobile business by cancelling policies subject to cancellation, and letting its other policies expire. Having in this manner terminated its automobile policies, its remaining liabilities to be reinsured would be few and the commissioner's burden in determining what liabilities remained would be light. (Maj. opn., *ante*, at p. 100.) The company could begin this process before applying to withdraw and, in fact, would have to do so in order to make sure that most of its policies expired before the commissioner ruled.

Even under the *majority view*, however, Proposition 103 fundamentally alters this process by preventing an automobile insurer from refusing to renew a policy until the insurer has applied to withdraw. If the approval process is "simple and expeditious" (maj. opn., *ante*, at p. 92), when the insurer receives that approval most of its policies will still be in force, and subject to a reinsurance requirement. Thus, the insurer will still be compelled to reinsure most of its policies. In such a case, the timing of the withdrawal process is not very different under the majority view and the dissent—but is substantially different from the practice prior to Proposition 103. It is in the case where the commissioner disapproves the withdrawal application that the majority and dissenting views would have very different results. But the majority do not take that case into account in their analysis.

In sum, both majority and dissent agree that Proposition 103 fundamentally alters the way in which an automobile insurer can discontinue its

California business. Previously, it could "run off" its business at any time, by simply refusing to renew policies as they expired; now there is a critical date before which the insurer cannot legally refuse to renew. The only question is which date is critical—that of the application to withdraw, or of its approval. Since, as we shall explain, the language and purpose of the withdrawal statutes make it clear that the granting of permission to withdraw—not the request for that act—is the legally significant event, that date should define the insurer's duties.

We begin our explanation by reviewing the statutes relating to the withdrawal of insurers. Section 1070 provides that "[a]ny insurer, upon payment of the fees and costs therefor and surrender to the commissioner of its certificate of authority, *may apply to withdraw* from this State . . . ." (Italics added.) Section 1071.5 provides that: "Every insurer which withdraws as an insurer, or is required to withdraw as an insurer, from this State shall, *prior to such withdrawal*, discharge its liabilities to residents of this State. In the case of its policies insuring residents of this State it shall cause the primary liabilities under such policies to be reinsured and assumed by another admitted insurer. In the case of such policies as are subject to cancellation by the insurer, it may cancel such policies pursuant to the terms thereof in lieu of such reinsurance and assumption." (Italics added.) Finally, section 1072 provides that: "The commissioner shall make . . . an examination of the books and records of the insurer. If, upon such examination, he finds that the insurer has no outstanding liabilities to residents of this State and no policies in favor of the residents of this State uncancelled or the primary liabilities under which have not been reinsured and assumed by another admitted insurer, as required by Section 1071.5, he shall cancel the insurer's certificates of authority, if unexpired, and he *shall permit the insurer to withdraw*. The commissioner may, in his discretion, waive any or all of the above requirements if, after such examination, he finds it to be in a solvent condition . . . ." (Italics added.)

Looking first to the language of these provisions, we note that the term "withdrawal," as used in these sections, refers to actions by the insurer done *after* the commissioner has cancelled the company's certificate of authority. Thus the initial surrender of the certificate is described not as "withdrawal," but as part of an application to withdraw. After applying, but before the actual withdrawal, the insurer is required to take action to assure that its obligations to California residents are discharged or protected. Finally, when the commissioner verifies that residents are protected, she cancels the certificate "and . . . shall permit the insurer to withdraw." (§ 1072.) The wording of these provisions makes it clear that up to the time when the

certificate is cancelled, the insurer is not a "withdrawing insurer,"[6] but one which remains an admitted insurer.

Looking next to the purpose of these provisions, we find a clear legislative policy to protect California residents against any loss occasioned by the insurer's withdrawal. (*Baer* v. *Associated Life Ins. Co.* (1988) 202 Cal.App.3d 117, 123 [248 Cal.Rptr. 236].) Under these statutes, it is the insurer's duty, before withdrawing, either to discharge or to secure all obligations to California residents, and the commissioner's duty to make sure this has been done before she approves the application to withdraw. The insurer may terminate its obligations to the insureds by cancelling the contract, when that is permitted under section 661; other obligations to the insureds or third parties may be terminated by payment. An insurer, however, may (and almost inevitably will) have contracts which cannot be cancelled, and obligations which are contingent and not yet matured. With respect to these obligations, it must reinsure, thus assuring that there will remain an admitted insurer responsible for the obligations to California residents. (See § 1071.5.) The Insurance Commissioner may waive compliance with the requirements of section 1071.5 only if she finds the insurer is solvent, and thus that withdrawal will not imperil the performance owed by the insurer.

The commissioner decides whether to approve an application to withdraw only after examining the outstanding liabilities, the reinsurance and assumption agreement, and the solvency of the insurer. The examination process may be lengthy and detailed, as the commissioner claims, or simple and expeditious, as the majority assert (maj. opn., *ante*, at p. 92), depending on the circumstances of the case. If the liabilities are few, the reinsurance agreement comprehensive, and the reinsurer's ability to perform unquestioned, the process may indeed be brief. If, on the other hand, liabilities are uncertain or extensive, the reinsurance agreement limited in scope, and the reinsurer's solvency or status questionable, one could expect a lengthy proceeding which might lead to denial of approval. An even lengthier proceeding might occur if an insurer of doubtful solvency applied to withdraw without a reinsurance agreement.

In sum, the purpose and function of the withdrawal statutes (§§ 1070-1072) is to empower the commissioner to protect California residents—both those who purchase insurance, and those who have claims on insurance

---

[6] The majority opinion from time to time refers to an insurer who has applied to withdraw, but not yet received permission to do so, as a "withdrawing insurer." (See, e.g., maj. opn., *ante*, at p. 101.) As explained in text, this usage is inconsistent with the statutory language, under which an insurer may not begin to withdraw from the state until its application to do so has been approved by the commissioner.

policies—by making sure that obligations owed California residents are either discharged or secured before the insurer begins the process of withdrawing from the state.[7] As remedial statutes enacted to protect the public, these provisions should be liberally construed (see *Bunner* v. *Imperial Ins. Co.* (1986) 181 Cal.App.3d 14, 21 [225 Cal.Rptr. 912]; *Brown* v. *Huntington Beach etc. Sch. Dist.* (1971) 15 Cal.App.3d 640, 647 [93 Cal.Rptr. 417]), with a view to giving the commissioner the authority and discretion necessary to safeguard the public welfare. (See *Calfarm, supra,* 48 Cal.3d 805, 824.)

The majority opinion, however, does not treat these statutes as important protective legislation, enacted to safeguard the public interest. To the contrary, the opinion seems to consider the statutory procedures as pointless formalities. If a company applies to withdraw, the majority expect the commissioner to say "yes," and to say it quickly. (See maj. opn., *ante,* at p. 92.) The majority opinion never even considers the possibility that the commissioner may have the authority, even the duty, to say "no."

But the case in which the commissioner says "no" is the one which demonstrates the mischief in the majority's holding. Since under the majority opinion a company which applies to withdraw need not, and indeed must not, renew policies,[8] by the date of the commissioner's ruling the insurer will have refused to renew some of its expiring policies. When the commissioner rejects the application, must the company renew those expired policies? If not, insurers have discovered an easy way to evade Proposition 103's restriction on nonrenewal while remaining in business in California—the company simply submits an inadequate application to withdraw, and starts sending out nonrenewal notices.[9] But if the insurer must renew its expired

---

[7] In the context of automobile insurance, we have to be concerned with two kinds of obligations: those owed the insureds, and those owed persons injured by the insureds.

[8] According to the majority, an insurer which has applied for permission to withdraw may renew policies when it is contractually obligated to do so, but not otherwise. (See maj. opn., *ante,* at p. 101, fn. 18.)

Virtually all life insurance policies, and a minority of automobile policies, give the insured a right to renew. Perhaps because Travelers' policies presumably do not, the majority opinion does not consider how the withdrawal statutes would operate in the presence of such a right. Yet the legislative history of those statutes, particularly the 1945 amendment (see maj. opn., *ante,* at p. 96), shows that the Legislature was particularly concerned with how life insurance companies could withdraw from California. It seems apparent that the Legislature, unlike the majority, sees no inconsistency in permitting an insurer to withdraw from California and yet insisting that the insurer renew its existing policies.

[9] The majority suggest that under some circumstances the commissioner could refuse to permit an insurer to abandon its withdrawal application. (See maj. opn., *ante,* at pp. 101-102.) (They do not discuss whether the commissioner could do so if the company reserved the right to abandon in the application itself.) But the problem with this remedy is that by forcing the insurer to go through with its plan to leave the California market, it would reduce the number of insurers and the availability of insurance, contrary to the purpose of Proposi-

policies, complications abound. Would the insurer be required to provide coverage nunc pro tunc? Would it then be entitled to collect back premiums? Would it reimburse insureds who have lost the use of their car because, lacking insurance, they could not legally drive? Would it reimburse insureds who have been fined for driving without coverage? If the insured has bought a new policy, which policy provides primary coverage for an accident during the interim period? The problems of trying to correct a large-scale refusal to renew by a remedial order issued months later are manifold. This whole can of worms[10] can be avoided by upholding the commissioner's ruling that an insurer must renew until the commissioner has approved its application and cancelled its certificate.

That ruling rests on the undisputed proposition that an insurer remains an admitted insurer until the commissioner has approved the application for withdrawal. It follows from that conclusion that the insurer remains subject to all laws governing the practices of admitted insurers. As the commissioner said in her decision below, "[d]uring the pendency of these lengthy and detailed [withdrawal] proceedings, insurers necessarily must continue to comply with all California statutes. No insurer can place itself above the law by the mere act of filing papers to withdraw."[11]

No one would question this conclusion as applied to statutes other than section 1861.03, subdivision (c). Section 661, for example, limits the authority of insurers to cancel policies; the parties assume that this limitation applies to a company that has applied for permission to withdraw. Section 790.03, subdivision (h)(15), makes it illegal for an insurer to mislead a claimant as to the applicable statute of limitations; certainly this governs a company which has applied to withdraw. Section 791 et seq. limits an

tion 103. The only remedy consistent with Proposition 103 would be to permit the insurer to abandon its application but require it to renew all expired policies. But as explained in text, this remedy presents many legal and practical problems if the insurer has failed to renew a substantial number of policies.

[10] "Basket of snakes" might be a better metaphor. The process of undoing a large-scale refusal to renew will not only be messy, but some people are likely to be hurt.

[11] The commissioner argued in her brief that once an insurer's certificate has been cancelled and it is no longer an admitted insurer, the insurer cannot service its outstanding policies. The majority point out that if this view were true, it would be difficult for an automobile insurer to leave this state, at least in an orderly and efficient fashion. (See maj. opn., *ante*, at pp. 98-99.) But as the majority convincingly demonstrate, the commissioner's claim that a withdrawn insurer cannot service policies is in error; a company that has received permission to withdraw may still fulfill its contractual obligations to process claims, provide defenses, pay judgments, and renew policies.

The commissioner's mistaken argument on this point does not undermine her conclusion that a company must renew up to the date when its application to withdraw is approved. To the contrary, the ability of a withdrawing company to service policies is what makes it possible for a company which has renewed up to the date of approval thereafter to conduct an orderly and efficient withdrawal.

insurer's right to disclose confidential information; surely this applies to an insurer which has applied for withdrawal. One can peruse the hundreds of statutes governing the conduct of insurers without finding any which would cease to apply to a company upon its mere application to withdraw.

The majority respond that "an insurer's status as admitted or nonadmitted is not [a] universal litmus test" (maj. opn., *ante*, at p. 99); there are some provisions which apply to some admitted insurers and not others. Section 1861.03, subdivision (c), the nonrenewal provision at issue here, is an example: it applies only to admitted automobile insurers. But while some statutes distinguish between types of insurance (e.g., fire insurance versus life insurance), or types of insurers (e.g., corporate insurers versus mutual insurers), none relieve an admitted insurer which has applied to withdraw from obligations imposed on one which has not.

The majority in effect create by judicial decision a new category of insurance company—one which is admitted, and bound by all laws governing admitted insurance companies of that type, except that it cannot issue new policies and has no right or statutory duty to renew policies.[12] No statute and no prior decision recognize the existence of such a category. The statutes governing the rights and duties of insurers admitted to California are detailed and comprehensive, and not in need of judicial amendment.

Indeed the only statutory support the majority offer for their innovation is a false analogy to the winding up of a corporation. When a corporation adopts a resolution to dissolve, they point out, it "shall cease to carry on business except to the extent necessary for the beneficial winding up thereof . . . ." (Corp. Code, § 1903.) Presumably the majority intend an analogy between a corporate resolution to dissolve, and an insurer's act of surrendering its certificate and applying to withdraw.[13] A corporate dissolution,

---

[12] If I read the majority opinion correctly, it is not limited to renewals by automobile insurers under section 1861.03, subdivision (c), but applies to all insurers seeking to withdraw from the California market. If, for example, a fire insurance company (which is not regulated by Proposition 103) applies to withdraw from California, under the majority view that company could not renew policies or write new policies while its application was pending—a limitation on its authority which does not appear in any statute, and was not previously declared by judicial decision. This may make it more difficult for a withdrawing insurer to find an admitted company willing to assume the liabilities under unexpired policies. If the insurer planning to withdraw could renew up to the time when its application is approved, it could offer the reinsurer a portfolio of annual policies which expire and come up for renewal at regular intervals throughout the year. But if it cannot renew policies during the period between application and approval, its portfolio is skewed by the absence of any policies expiring during those months in the following year.

[13] Under Corporations Code sections 1900-1903, a company begins to wind up its business immediately after the stockholders or directors vote to dissolve, not from the subsequent date when it notifies the Corporations Commissioner of its election to dissolve. If the majority be-

however, is a one-step proceeding. Once it has resolved to dissolve, the decision is made, and everything thereafter is part of the process of dissolution. The corporation needs no permission from any state official, and there is no danger that a subsequent state ruling will force the corporation to. undo actions taken pursuant to the resolution. An insurer's withdrawal, on the other hand, is a multi-step process. First the insurer decides it wants to withdraw, then it applies for permission to do so, then the commissioner grants that permission, and finally the company withdraws. The last point of decision, when the process can be halted and reversed, is not the corporate resolution but the ruling of the commissioner. In the insurance context, consequently, the commissioner has the last word, and the date when she decides to approve or disapprove the withdrawal application is the critical date which should define the duties of the insurer.

The only decisional authority the majority cite is a New York trial court decision, *People* ex rel. *Lewis* v. *Safeco* (1978) 98 Misc.2d 856 [414 N.Y.S.2d 823], but that decision in fact supports this dissent. In the New York case, the Superintendent of Insurance had prohibited two insurers from surrendering their licenses because they were obliged by statute to renew no-fault insurance policies. The court held that the superintendent could not require the insurer to renew policies and remain in business indefinitely. Since New York had no statute governing when and how companies could withdraw, the court sought to fashion a remedy itself. It concluded that the superintendent could require the insurers to service existing policies and "to renew certain other policies for a short period so that during such periods, those presently insured may be able to obtain follow-up coverage[.]" (414 N.Y.S.2d at p. 830.) At the expiration of that period the insurers would be permitted to surrender their licenses. The decision thus supports the majority opinion's position on the broader issue which we need not decide—that once an insurer has withdrawn it is not statutorily required to renew policies. On the issue before us, however, *its holding that an insurer may be required to renew policies after it has applied to withdraw* is inconsistent with the position of the majority opinion, and consistent with the views of the Insurance Commissioner and this dissent.

My conclusion is simple: Travelers remains an admitted insurer until the commissioner permits it to withdraw and cancels its certificate. As an admitted insurer, it must obey all laws regulating such insurers. Nothing in section 1861.03, subdivision (c), makes that provision an exception to this rule. Thus, whether or not Travelers could refuse to renew once it has

lieved their analogy was on point, they would argue that an insurer could refuse to renew policies from the date when its board of directors had resolved to withdraw from the California market, not from the date when it applied to the Insurance Commissioner for permission to withdraw.

actually withdrawn from California, it had no right to do so upon the filing of an application to withdraw. The commissioner properly found that Travelers' nonrenewal notices did not comply with California law.

This conclusion is the only one consistent with the spirit, as well as the letter, of Proposition 103. That initiative was not enacted to make it easy for insurers to terminate coverage, but to make insurance more available to Californians and to protect them against loss of coverage. I would deny the petition for a peremptory writ of mandate.

Mosk, J., concurred.