[Nos. A106606, A107365. First Dist., Div. Two. Feb. 28, 2006.]

OHIO CASUALTY INSURANCE COMPANY et al., Plaintiffs and Appellants, v.
JOHN GARAMENDI, as Insurance Commissioner, etc., et al., Defendants and Respondents;
THE CALIFORNIA FAIR PLAN ASSOCIATION, Real Party in Interest and Respondent.

## COUNSEL

Skadden, Arps, Slate, Meagher & Flom, Darrel J. Hieber and Micol Small for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Mark P. Richelson, Anne Michelle Burr, and Marla K. Markman, Deputy Attorneys General, for Defendants and Respondents.

Lewis Brisbois Bisgaard & Smith, Richard B. Wolf, Michael W. Connally and Bernadette M. Chala for Real Party in Interest and Respondent.

**OPINION**

**RUVOLO, J.**[*]—

## I.

### INTRODUCTION

Appellants are three affiliated insurance companies—Ohio Casualty Insurance Company (Ohio Casualty), West American Insurance Company (West American), and American Fire and Casualty Company (American Fire).[1] They appeal from the superior court's denial of their petition for writ of administrative mandamus or writ of mandate (the petition). The petition challenged an order of the California Insurance Commissioner (the Commissioner) requiring appellants to pay certain assessments imposed by California's FAIR Plan Association (Fair Access to Insurance Requirements; Ins. Code, § 10090 et seq.[2] (FAIR Plan)) for 1993 and 1994, totaling over $3 million.

Established in 1968, the FAIR Plan obligates all real and personal property insurers to establish a program to apportion among themselves the responsibility for providing basic property insurance for those who, after diligent efforts, are unable to obtain insurance through normal market channels. (§§ 10093, subd. (a), 10094.) By statute, the cost of writing and issuing FAIR Plan policies, including profits and losses, are borne proportionately by California property insurers based on the amount of business each insurer conducted in the state two years earlier. (§ 10095, subd. (c).[3])

In this appeal, appellants claim the trial court erred in denying their petition and upholding the Commissioner's decision because it was based on the erroneous conclusion that the FAIR Plan statutory scheme requires

---

[*]Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Appellants comprise three of the six companies that form the Ohio Casualty Group of Insurance Companies, one of the nation's leading insurance groups.

[2] All undesignated statutory references are to the Insurance Code. The California FAIR Plan Association has filed a separate respondent's brief in this matter, but also adopts by reference the arguments made by the Commissioner in his brief. The FAIR Plan and the Commissioner will be jointly referred to as "respondents."

[3] The simple command of section 10095, subdivision (c), in pertinent part, reads: ". . . each insurer shall participate in the writings, expenses, profits and losses of the association in the proportion that *its* premiums written during the second preceding calendar year bear to the aggregate premiums written by all insurers in the program, excluding that portion of the premiums written attributable to the operation of the association. . . ."

insurers who have decided to withdraw from the California market to remain FAIR Plan members and continue writing new FAIR Plan business—with "catastrophic exposure"—for two years after they surrender their certificates of authority or cease writing new insurance business in California. Urging reversal, appellants claim the Commissioner's decision was based on a misinterpretation of the FAIR Plan statutes, and was issued in derogation of the rights of insurance companies attempting to withdraw from the California market, as set out in *Travelers Indemnity Co. v. Gillespie* (1990) 50 Cal.3d 82 [266 Cal.Rptr. 117, 785 P.2d 500] (*Travelers*). We disagree and affirm. However, we reverse as to the amount of interest awarded in this case, and remand the matter to the trial court for a recalculation of the interest to be included as part of the overall award.

## II.

### FACTS AND PROCEDURAL HISTORY

Appellants held certificates of authority[4] to do business in California for many years and earned reputations as providers of high-quality insurance products and services. However, in May 1992, appellants' parent company decided to withdraw appellants from the California insurance market for business reasons and planned to commence the withdrawal process by the end of the year.

In June 1992, appellants informed the California Department of Insurance (the Department) of their intention to withdraw from the state and submitted a withdrawal plan for the Department's approval. The plan proposed that appellants would file withdrawal applications and surrender their certificates of authority on December 31, 1992. After that date, appellants would cease writing new or renewal policies but would continue to service existing business until all policies had expired or terminated. Appellants requested the Department to waive the statutory reinsurance and assumption requirements[5] applicable to withdrawing insurers, but the Department denied the request.

---

[4] An insurer must have a "certificate of authority" issued by the Commissioner before it can engage in insurance business in California. (§§ 24, 700, subd. (a).) The certificate is the insurer's source of authority to transact whatever lines of insurance it specifies. (*Ibid.*)

[5] The reinsurance and assumption requirements are contained in section 1071.5, which provides in pertinent part: "Every insurer which withdraws as an insurer . . . from this State shall, prior to such withdrawal, discharge its liabilities to residents of this State. In the case of its policies insuring residents of this State it shall cause the primary liabilities under such policies to be reinsured and assumed by another admitted insurer . . . ."

After further discussions with the Department, appellants adopted a modified plan under which appellants would withdraw in two stages. In the first stage, Ohio Casualty and West American would surrender their certificates of authority to the Commissioner after reinsuring their primary liabilities with American Fire. During this stage, American Fire would maintain its certificate of authority until its own primary liabilities and the liabilities ceded to it by Ohio Casualty and West American had terminated. In the second stage, American Fire would apply to withdraw and surrender its certificate of authority to the Commissioner.

On December 3, 1992, in accordance with appellants' modified withdrawal plan, American Fire assumed and reinsured Ohio Casualty's and West American's basic property insurance liabilities. On December 4, 1992, Ohio Casualty and West American submitted applications to withdraw and surrendered their certificates of authority to the Commissioner. American Fire retained its certificate of authority for the purposes of running off its own business and fulfilling its obligations as a reinsurer according to the withdrawal plan. American Fire continued to service its existing property insurance policies but, like Ohio Casualty and West American, wrote no new or renewal business in California after December 4, 1992. The Commissioner did not cancel appellants' certificates of authority until 1995.

Nearly one year after appellants stopped writing new or renewal insurance policies in California, they each received a letter dated November 17, 1993, from the FAIR Plan. In these letters, the general manager of the FAIR Plan informed appellants that "[i]t is necessary" to "assess member companies" for the "losses arising out of the recent brush fires in Southern California." Appellants were informed they were being assessed a total of $1,977,180, based on their 1993 and 1994 "participation" in the FAIR Plan.

By letters dated November 30, 1993, appellants responded, claiming that they were not subject to the 1993 and 1994 assessments since they surrendered their certificates of authority or stopped writing property insurance in the state on December 4, 1992.

On April 21, 1994, the FAIR Plan sent appellants a second assessment notice, informing them that it was "necessary" for the FAIR Plan to "assess member companies" for losses arising from the Northridge earthquake of January 17, 1994. These new assessments brought the total for 1993 and 1994 to $2,596,711, but appellants were warned "that losses [from the Northridge earthquake] are still developing, and it is possible that a further cash call may be necessary."

On November 23, 1994, appellants were sent "a further cash call" for additional FAIR Plan losses arising from the Northridge earthquake. The FAIR Plan also advised appellants that their "original 1993 participation rate ha[d] been revised," and that appellants' purported "share of the previous assessments for the brush fires and earthquake" had therefore been recalculated. As a result, the total assessments for 1993 and 1994 were $3,103,153.[6]

Appellants refused to pay the assessments on the ground that they were not members of the FAIR Plan during 1993 and 1994. They claimed "the clear and unambiguous language of the [FAIR Plan] Statute, the legislative history, and the Plan of Operation expressly limit membership in the Association to those licensed insurers that are engaged in writing property insurance in the state."[7] Appellants claimed that none of the companies qualified for FAIR Plan membership during pool years 1993 and 1994 because none of the companies were engaged in writing new or renewal property insurance in California since December 4, 1992. Moreover, two of the companies (Ohio Casualty and West American) had not been licensed to write property insurance in the state since December 1992, when they surrendered their certificates of authority to the Commissioner with the intention of withdrawing from the California insurance market.

The FAIR Plan, on the other hand, contended that appellants were obligated to pay their shares of the assessments for pool years 1993 and 1994, because they had premiums written two years earlier, in 1991 and 1992, the years that formed the statutory basis for participation in losses in pool years 1993 and 1994. Under the FAIR Plan statutes, "each insurer" must "participate in the . . . profits and losses of the association in the proportion that its premiums written during the second preceding calendar year bear to the aggregate premiums written by all insurers in the program, excluding that portion of the premiums written attributable to the operation of the association." (§ 10095, subd. (c).)

Invoking this statute, the FAIR Plan took the position that an insurer's participation in the FAIR Plan's profits and losses is in direct proportion to the insurer's share of direct written premiums written two years earlier, as reported by the insurer to the Department. It is undisputed that appellants were licensed and actively engaged in writing California basic property insurance during 1991 and 1992. Thus, the FAIR Plan claimed that Ohio

---

[6] Appellants' $3.1 million assessment for 1993 and 1994 pool year losses includes $593,969 billed to Ohio Casualty, $2,321,465 billed to West American, and $187,717 billed to American Fire.

[7] The "Plan of Operation," referred to in appellants' argument, is a statutorily mandated document, subject to the Commissioner's approval, implementing the FAIR Plan statutes. (§ 10095, subds. (a)–(f).)

Casualty and West American could not relieve themselves of their assessment obligations by surrendering their certificates of authority on December 4, 1992, and that none of the three companies escaped liability, as they contended, by ceasing to write new insurance in California after that date.

Appellants eventually appealed the assessments to the Commissioner, who assigned the appeal to an administrative law judge. The Commissioner adopted the administrative law judge's decision, which was reached after six days of live testimony and the introduction of hundreds of documents. The Commissioner determined that appellants could not escape their FAIR Plan assessment liabilities by surrendering their certificates of authority or by ceasing to issue new policies. To the contrary, the Commissioner found appellants remained FAIR Plan members during 1993 and 1994, and were therefore liable for FAIR Plan assessments for those years, because appellants reported positive premiums written for calendar years 1991 to 1992, the years that form the basis for their FAIR Plan liabilities. The Commissioner reasoned, "Under the FAIR Plan statutes . . . an insurer's duty to participate in association pools arises when it enters the basic property insurance market in California. That duty continues until the member insurer has no premiums written in the second preceding calendar year. (Ins. Code, § 10095, subd. (c).)"

Appellants filed their petition challenging the Commissioner's order. The superior court, however, denied their petition, essentially adopting the Commissioner's construction of the FAIR Plan statute. Moreover, the court ordered appellants to pay interest on the assessments at a rate of "ten percent (10%) per annum starting thirty days after the date of notice for each assessment."[8] These appeals followed.[9]

## III.

### DISCUSSION

### A.  Standard of Review

Appellants have repeatedly disclaimed any intention of challenging the Commissioner's factual findings and have adamantly insisted that they are only challenging the legal conclusions reached by the Commissioner. We have taken appellants at their word. Consequently, " 'we discuss the legal questions involved while presuming that the underlying . . . findings of fact

---

[8] According to the FAIR Plan, the unpaid assessment against appellants, including 10 percent interest, has now grown to $6 million.

[9] Appellants first filed a notice of appeal from the court's order denying their petition and then filed another appeal from the judgment. Because the judgment merely adopts the order, the parties have stipulated to consolidate these two appeals for all purposes.

are supported by substantial evidence.' [Citation.]" (*State Farm Mutual Automobile Ins. Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 72 [91 Cal.Rptr.2d 381].)

In examining appellants' statutory obligations to the FAIR Plan, respondents claim we should defer to the Commissioner's decision upholding these assessments because the Legislature has delegated to the Commissioner the power to interpret and implement the FAIR Plan statutes. (§§ 10095, subd. (g), 10096, subd. (1) [on appeal from a FAIR Plan governing committee decision, "the commissioner may make any order to implement the purposes of the chapter and the plan"].) Although we independently determine the meaning of a statute, if an agency charged with administering the statute issues its own interpretation, we will give " 'great weight and respect to the administrative construction. . . .' [Citations.]" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).)

But the weight to be accorded to an agency's interpretation is "fundamentally situational" and depends upon " 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' [Citation.]" (*Yamaha, supra*, 19 Cal.4th at pp. 12, 14–15, italics omitted, quoting *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 [89 L.Ed. 124, 65 S.Ct. 161].) An agency's consistent maintenance of the interpretation under scrutiny, " 'especially if [it] is long-standing,' " is a circumstance which weighs in favor of judicial deference. (*Yamaha, supra*, 19 Cal.4th at p. 13, quoting *Culligan Water Conditioning v. State Bd. of Equalization* (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593].) Applying these principles, we determine whether appellants have demonstrated that the Commissioner's interpretation of the FAIR Plan statutes, as embodied in his order upholding these assessments, was unreasonable or conflicted with legislative intent.

█ Since, ordinarily, the best indication of legislative intent is the language of the statute itself, we proceed to examine the FAIR Plan statutory scheme. We turn first to the words of the statute itself, seeking to give the words employed by the Legislature their usual and ordinary meaning. (See *Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324].) As particularly relevant here: "The language must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute [citation], and where possible the language should be read so as to conform to the spirit of the enactment. [Citation.]" (*Rudd v. California Casualty Gen. Ins. Co.* (1990) 219 Cal.App.3d 948, 952 [268 Cal.Rptr. 624]; see *Israni v. Superior Court* (2001) 88 Cal.App.4th 621, 636 [106 Cal.Rptr.2d 48].)

## B. The California FAIR Plan Statutory Scheme

Established in 1968, the FAIR Plan is an involuntary association of all property insurers within California. (§ 10091, subd. (a).) The FAIR Plan is obligated to write insurance for all properties that meet its underwriting standards, even if those properties are located in areas deemed uninsurable by the normal insurance market. (§§ 10093, subd. (a), 10094; see *Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 564 [53 Cal.Rptr.2d 878].) The FAIR Plan does not have insurance agents. Instead, it is obligated to establish a statewide toll-free telephone number to accept applications from every licensed property and casualty insurance professional, as well as directly from insureds. (§§ 10095.5, 10095, subd. (h).) The FAIR Plan Association issues FAIR Plan property insurance policies on behalf of its members. Under the plan of operation, each member is considered to be a direct insurer for its share of the Plan's writings. All insurers participate in the FAIR Plan's profits and losses according to the amount of business they write in the state two years earlier. (§ 10095, subd. (c).) Since 1971, the FAIR Plan's fiscal year has begun October 1 and ended September 30, so that insurers could report to the Department on a calendar year basis the annual FAIR Plan financial results.

When the FAIR Plan was created, the association was to consist of "all insurers licensed to write and engaged in writing" basic property insurance on a direct basis in California.[10] (§ 10094.) As new insurers became licensed to write and engaged in writing property insurance in California they, too, were required to participate in the FAIR Plan. (§ 10094.) The statute provides that "Every insurer so described" that becomes a FAIR Plan participant "shall remain a member as a condition of its authority to transact [basic property] insurance in this state." (§ 10095, subd. (a).)

Appellants appear to concede that, at least by 1980, they all were both licensed to write and engaged in writing basic property insurance, or some component thereof, in California, on a direct basis.[11] Consequently, under section 10095, subdivision (a), appellants became FAIR Plan members "as a condition of [their] authority to transact [basic property] insurance in this state." Appellants' FAIR Plan membership obligations are spelled out in section 10098: "All insurers, on and after the effective date of this chapter, by continuing to hold a certificate of authority to transact insurance business shall

---

[10] "Insurer" was defined by the statute broadly, to mean ". . . any person who undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event, and shall include reciprocals and interinsurance exchanges." (§ 10091, subd. (f).)

[11] *Ohio Casualty* and *West American* became FAIR Plan Association members when the association was formed in 1968, and *American Fire* became a member when it entered the California market in 1980.

*be deemed to have consented to the responsibilities imposed by this chapter.*" (Italics added.) So, at least by 1980, by continuing to hold their certificates of authority, appellants had consented to the responsibilities of FAIR Plan membership as defined by the FAIR Plan statutes.

Respondents stress that the FAIR Plan is not a voluntary association. They also stress that nowhere in the FAIR Plan statute does it state that a solvent insurer is relieved of its FAIR Plan participation responsibilities by either surrendering its certificate of authority or by ceasing to write property insurance in California.[12] To the contrary, respondents claim that appellants' continued participation in the FAIR Plan is governed by section 10095, subdivision (c), which mandates that "*each insurer shall* participate" in the FAIR Plan's "writings, expenses, profits and losses . . . in the proportion that its premiums written during the second preceding calendar year bear to the aggregate premiums *written by all insurers*" in the FAIR Plan, excluding operating expenses. (Italics added.)

In defending these assessments below, the FAIR Plan explained its view of the obligations imposed by section 10095, subdivision (c): "[P]remiums written in one year form the basis of a company's pool participation two years later. Consequently, when [appellants] had premiums written of $66.8 million in 1991 and $45.9 million in 1992, the rights and obligations it held by 1992 were established for all time. Put another way, each premium dollar [appellants] received from production in 1991 or 1992 was impressed with an obligation that became fixed in proportion to its fellow Association members' production in each of the same years. Once the relationship among members became fixed, [appellants] could not alter it by simply filing a petition to withdraw from the state." Throughout its history, invoking section 10095, subdivision (c), the FAIR Plan has required each insurer to continue participating in the FAIR Plan until that insurer no longer has premiums written during the second preceding calendar year. For convenience and brevity, the FAIR Plan's construction is called the statutory participation rule.

The Commissioner endorsed the statutory participation rule in his opinion, saying: "Under the FAIR Plan statutes, as we have noted, an insurer's duty to participate in association pools arises when it enters the basic property insurance market in California. That duty continues until the member insurer has no premiums written in the second preceding calendar year. (Ins. Code, § 10095, subd. (c).)"

---

[12] The absence of such a provision distinguishes the FAIR Plan statute from other statutory schemes relied upon by appellants, such as the California Automobile Assigned Risk Program, which specifically states that "[a]n insurer that is no longer licensed to write automobile insurance in this state . . . shall not receive new assignments." (§ 11621.2, subd. (a).) Also, the section of the plan of operation relied upon by appellants dealing with *insolvent* insurers does not purport to define the obligations of *solvent* insurers.

Despite the long-standing administrative acceptance and endorsement of the statutory participation rule, appellants argue that by 1993 and 1994, the years the FAIR Plan policies covering the losses were written, appellants were excluded from FAIR Plan membership. Appellants claim, "the FAIR Plan Statute *repeatedly* makes clear insurers *become and remain members* by being 'licensed to write and engaged in writing' property insurance . . . ." Appellants emphasize that "[n]one of the Companies was 'engaged in writing' basic property insurance in California in 1993 or 1994; each stopped writing any insurance as of December 4, 1992. For this reason alone, the clear and unambiguous statutory language makes clear that the Companies no longer are members of the [FAIR Plan] Association and cannot be liable for Plan losses" sustained in 1993 and 1994.

Appellants derive the statutory framework for their argument from the phrase "insurers licensed to write and engaged in writing" property insurance as used in several sections of the FAIR Plan statutes. For example, section 10091, subdivision (a), states that the FAIR Plan is a "joint reinsurance association" "formed by insurers *licensed to write and engaged in writing* basic property insurance within this state . . . ." (Italics added.) In both sections 10094 and 10095, subdivision (a), the Legislature specifically focused on what it required to happen "[w]ithin 30 days after the effective date of this chapter . . . ." Section 10094 required that "all insurers *licensed to write and engaged in writing* in this state, on a direct basis, basic property insurance or any component thereof in multiperil policies, shall establish an industry placement facility, the California FAIR Plan Association . . . ." (Italics added.)

Similarly, section 10095, subdivision (a) focused expressly upon a deadline of "[w]ithin 30 days following the effective date of this chapter" for the FAIR Plan to submit for the Commissioner's review "a *proposed* plan of operation, consistent with the provisions of this chapter, *creating* an association consisting of all insurers *licensed to write and engaged in writing* in this state, on a direct basis, basic property insurance or any component thereof in homeowners or other dwelling multiperil policies." (Italics added.)

We first note the obvious. The plain language of the "licensed to write and engaged in writing" phrases in sections 10091, subdivision (a), 10094 and 10095, subdivision (a) focused upon *the creation of the FAIR plan* or the deadline for proposing *the original plan of operation.* Ignoring the context of those sections, appellants assert the Legislature intended that language to define the scope and duration of participation in the FAIR Plan. However, those sections do not address the issue involved here, which is how long an insurer that has become a FAIR Plan participant must continue to participate after deciding to withdraw from the California market.

■ On closer analysis, the precise language used in the statutes governing FAIR Plan membership answers that question, and refutes appellants' argument that an insurer remains a FAIR Plan member only so long as that insurer is both licensed to write and engaged in writing basic property insurance. To the contrary, once an insurer becomes a FAIR Plan member, that insurer "shall remain a member *as a condition of its authority to transact* [basic property] insurance in this state." (§ 10095, subd. (a), italics added.) As the Commissioner pointed out, an insurer withdrawing from California still has statutory authority to "transact" basic property insurance after it surrenders its certificate of authority and after it ceases writing insurance, because, in closing out its affairs, the insurer handles matters "subsequent to" and "arising out" of the insurance contracts remaining on its books. (§ 35, subd. (d)[13]; *Travelers, supra,* 50 Cal.3d at pp. 98–99 & fn. 17.) In the instant case, appellants had authority to "transact" property insurance during pool years 1993 and 1994. Consequently, appellants remained FAIR Plan members, whether or not they continued to be "licensed to write" or "engaged in writing" basic property insurance in California.

■ Appellants also seek to avoid the application of section 10095, subdivision (c), which mandates FAIR Plan participation until they have no premiums written during the second preceding year, by asserting that "insurer" as used in that section refers only to insurers "licensed to write and engaged in writing" basic property insurance in the state. However, the words used in the statute to describe participating insurers do not support that contention. Section 10095, subdivision (c) does not say that only "*such* insurers that are *licensed to write and engaged in writing*" shall participate in FAIR Plan profits and losses, as claimed by appellants; it requires "*each* insurer" with premiums written during the second preceding calendar year to participate proportionately. (Italics added.)

When considering appellants' arguments on this point, they place their strongest reliance upon an administrative interpretation of the FAIR Plan statutes in the statutorily mandated plan of operation. (§ 10095.) The version of the plan of operation in effect at the time of these assessments provided the FAIR Plan Association shall be authorized "[t]o write and issue policies of insurance as provided in this Plan [of Operation] on behalf of its Insurers . . . ." The Plan then defined "insurer" as "[a]ny insurance company or other organization which is *authorized to write and is engaged in writing property insurance business*, on a direct basis, in this State. . . ." (Italics added,

---

[13] "Transact"is defined by section 35 as follows: " 'Transact' as applied to insurance includes *any* of the following: [¶] (a) Solicitation. [¶] (b) Negotiations preliminary to execution. [¶] (c) Execution of a contract of insurance. [¶] (d) *Transaction of matters subsequent to execution of the contract and arising out of it.*" (Italics added.) Appellants concede that after they submitted applications to withdraw and surrendered their certificates, they "continued to *service* existing policies, including issuing endorsements to amend coverage . . . ."

fn. omitted.) Appellants claim the plan of operation confirms that only those companies "authorized to write" and "engaged in writing" property insurance "on a direct basis" are required to participate in the issuance of FAIR Plan policies, even if the company had actively engaged in selling insurance in the state two years earlier.

■ However, it is an elementary proposition that statutes control administrative interpretations; and, as we have seen, appellants' interpretation is contrary to the governing FAIR Plan statutes. The select portion of the plan of operation in question cannot alter or redefine the statutory parameters of FAIR Plan participation; and to the extent that it can be read to do so, it is void. (See generally *California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11–12 [270 Cal.Rptr. 796]; see also *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 419–420 [128 Cal.Rptr. 183, 546 P.2d 687]; *City of San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374 [88 Cal.Rptr. 12] ["It is fundamental that an administrative agency may not usurp the legislative function, no matter how altruistic its motives are."]; *Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75 Cal.App.4th 1315, 1341 [90 Cal.Rptr.2d 54].)

In any event, it would be nonsensical to interpret the plan of operation's definition of "insurer" as a sub silentio endorsement of a legal proposition that would effectively gut the statutory participation rule when the FAIR Plan has consistently taken the position that its member insurers must participate in the FAIR Plan profits and losses until they have no premiums written in the second preceding year, even after they have commenced the withdrawal process and ceased writing new business.[14]

■ In considering appellants' proposed interpretation, respondents' arguments implicate the rule which requires this court, in cases where uncertainty exists regarding the meaning of a statute, to consider the consequences flowing from a particular interpretation. (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 235 [45 Cal.Rptr.2d 207, 902 P.2d 225]; *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165–1166 [278 Cal.Rptr. 614, 805 P.2d 873]; *Dyna-Med,*

---

[14] The Commissioner and the trial court both found the FAIR Plan has used the statutory participation rule during its entire existence. Although the FAIR Plan had never levied a major cash call on its members until 1991, it has made numerous distributions for profitable earlier pool years. In fact, the FAIR Plan has distributed about $106 million to insurers, including appellants, which have received more than $1.35 million of that sum. In doing so, the FAIR Plan has included as participants each member until its written premium went to zero or became negligible for the second calendar year preceding the subject pool year. The Fair Plan Association has made these assessments and distributions without regard to whether or when an insurer's certificate of authority was canceled or whether an insurer was no longer authorized to transact insurance.

*Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) In so doing, we endorse respondents' concern about the grave public policy implications which would result if appellants' interpretation of the FAIR Plan statutes was adopted.

Allowing insurers to escape assessments simply by surrendering their certificates of authority and/or ceasing to write insurance could lead to widespread insurer withdrawal any time disaster strikes, thereby interfering with the FAIR Plan statutory purpose of assuring the availability of basic property insurance. (See § 10090, subd. (a).) In fact, under appellants' view, insurers newly licensed by the state could write property insurance here for two years and *never* insure FAIR Plan risks if they ceased writing insurance or surrendered their certificates by the end of the second year. Thus, resolution in appellants' favor could create a property insurance market characterized by semi-annual entries and departures, thus destabilizing the property insurance market in California. (See § 10090, subd. (a).) Predictably, insurer withdrawal would unfairly impact insurers who continuously operate in the California market, and their premium-paying policyholders, as they would be left to assume the obligations of the withdrawing insurer, thus shouldering an inequitable distribution of FAIR Plan risks. Consequently, adoption of appellants' proposed interpretation of the FAIR Plan statutes would have grave adverse public policy consequences to the insurance-buying public as well as those insurers who shoulder their fair share of FAIR Plan responsibilities. We cannot presume the Legislature intended such consequences.[15]

Because the Commissioner thoroughly considered the issue and reached a reasonable conclusion in harmony with the FAIR Plan statutes, long-standing administrative construction, and public policy considerations, we see no reason to overturn his decision upholding these assessments. (See *Yamaha, supra*, 19 Cal.4th at pp. 12–15.)

## C. An Insurer's Right to Withdraw—*Travelers*

Emphasizing the ostensible tension between appellants' rights as withdrawing insurers and their obligations under California's FAIR Plan, appellants next claim that respondents' long-standing statutory participation rule "must be rejected because it is inconsistent with the Supreme Court's decision in *Travelers*." (Italics added, underscoring omitted.) Both the Commissioner and

---

[15] On the other hand, the news is not all bad for withdrawing insurers. While appellants were faced with significant assessments to cover regrettable natural disasters in California which occurred during the last two years of their participation in the FAIR Plan, in other years the plan might experience a surplus, as it has in the past. In those years, withdrawing insurers would receive premium surplus payments *from* the FAIR Plan during their waning years of plan participation.

the trial court found that *Travelers* was manifestly inapplicable to this case and could not be read to relieve a property insurer withdrawing from California from its obligations to the FAIR Plan under the statutory participation rule. We agree.

In *Travelers*, the Supreme Court considered whether section 1861.03, subdivision (c), which prohibited insurers from refusing to renew automobile insurance policies unless specified grounds are present (hereafter mandatory renewal provision), applies to insurers that have commenced the statutory withdrawal process.[16] The *Travelers* court concluded that "the mandatory renewal provision, which was adopted as part of the initiative measure known as Proposition 103, was not meant to apply in these circumstances . . . ." (*Travelers, supra*, 50 Cal.3d at p. 85.) Requiring mandatory "renewal of [existing] automobile policies is fundamentally inconsistent with the act of withdrawing and would greatly burden and complicate the withdrawal process . . . ." (*Id.* at p. 100.) The Supreme Court repeatedly made clear that it was evaluating only Proposition 103 and that it was doing so, because, "[a]n insurer who is precluded from cancelling and is required to renew its automobile policies cannot discontinue its California business." (50 Cal.3d at p. 94.)

■ By contrast, both the Commissioner and the trial court found that fulfilling the obligations imposed by the FAIR Plan "does not prevent an insurer from the orderly winding up of its affairs in California nor impose a burden on an insurer that would preclude it from being able to withdraw from California." We agree. In *Travelers*, the Supreme Court was concerned that compelling an insurer to renew automobile policies during the pendency of its withdrawal application would prevent the insurer from withdrawing from the California market "for the indefinite future." (*Travelers, supra*, 50 Cal.3d at p. 97.) The *Travelers* court observed that Proposition 103's mandatory renewal provisions would pose such a barrier to withdrawal, that "it is difficult to see how an insurer with automobile policies in force could ever leave the state." (50 Cal.3d at p. 99.)

In contrast to being indefinitely burdened with renewal obligations, the FAIR Plan requires an insurer to fulfill its *two-year* statutory participation obligations as part of its withdrawal from the state. Evidence was presented at the administrative hearing that in the 30 years since the FAIR Plan statute came into existence, many property insurers have fulfilled their FAIR Plan participation responsibilities and have successfully withdrawn from the state. Consequently, the record in this case clearly demonstrates that the statutory

---

[16] Section 1861.03 provides that automobile policies are cancelable (or renewal may be refused) only for: (1) nonpayment of premiums; (2) fraud or material misrepresentation affecting the policy; or (3) a substantial increase in the risk insured against.

participation rule does not impose the same burden on withdrawing insurers as does Proposition 103's mandatory renewal provisions.

The *Travelers* court also focused on the statutory scheme under which an insurer withdraws from the California market. (§ 1070 et seq.) The court stated that "the most reasonable interpretation of the applicable statutes is that once the withdrawal process has been properly commenced by compliance with the statutory withdrawal application requirements, including the surrender of the insurer's certificate [of authority] to the Commissioner for cancellation, the applicant has the particular status of a withdrawing insurer . . . ." (*Travelers*, *supra*, 50 Cal.3d at p. 100.) The *Travelers* court explained that the surrender of the certificate of authority "is not purely symbolic." (*Id.* at p. 101.) "[A]n insurer, by the act of surrendering its certificate for cancellation, has committed itself to the orderly winding up of its affairs in this state and may not thereafter write new business in this state while its certificate remains in the Commissioner's possession. Consequently, a withdrawing insurer differs from other admitted insurers in at least one highly significant respect: it may not write new business." (*Ibid.*, fn. omitted.)

Appellants rely on this language to argue that the statutory participation rule cannot be invoked "to require Ohio Casualty and West American to take on FAIR Plan business written <u>after</u> they surrendered their certificates of authority on December 4, 1992." (Underscoring in original.) Appellants argue that "[r]equiring an insurer to be a 'direct insurer' of new property insurance—with admittedly potential catastrophic exposure—for two or more years after surrendering its certificate is also 'fundamentally inconsistent with the act of withdrawing' . . . ." (Underscoring omitted.) In making these arguments, appellants repeatedly characterize themselves as "direct insurers" who are involuntarily required to "write new business" even though they are attempting to withdraw from the California insurance market.

However, the administrative record brings appellants' arguments into question. Appellants' FAIR Plan participation does not require appellants to issue new insurance policies that they would have to underwrite and administer themselves. The FAIR Plan, rather than appellants, performs all the functions of an insurer on the policies it issues. It underwrites the policies, pays producers' sales commissions, bills and collects premiums, renews or cancels policies, adjusts any claims and does the accounting related to the Plan's operations. Consequently, appellants perform no direct operational functions on FAIR Plan policies other than participation in the profits or losses for the years of FAIR Plan participation.

Moreover, appellants vastly overstate the significance of a provision in the plan of operation which states that an insurer participating in the FAIR Plan

is *"considered to be a direct insurer* for its share in such writings." (Italics added.) It was explained at the administrative hearing that this nomenclature was adopted to reflect that "for every risk we write, the insurance company is the direct writer for that percentage that reflects their participation in the California insurance market." Consequently the obligations imposed on appellants as "direct insurer[s]" are simply those prescribed by the statutory participation rule.

On this record, appellants' argument that they are being forced to assume the onerous financial and administrative burdens of direct insurers writing new insurance business in California is both misleading and incomplete. The Commissioner has expressed no interest in forcing a company that is withdrawing from the California market to write new insurance in California. Such a result would be directly contrary to *Travelers* and the right of every admitted insurer to discontinue its California business by withdrawing from the state. (See *Travelers, supra,* 50 Cal.3d at p. 98; *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 331 [32 Cal.Rptr.2d 807, 878 P.2d 566] (conc. opn. of Mosk, J.) ["each and every insurer" has a " 'right to withdraw' "].) Instead, the Commissioner has required appellants to fulfill their *preexisting statutory duty* to participate in pool year losses for 1993 and 1994 because they wrote property insurance in California during 1991 and 1992.

Lastly, *Travelers* does not purport to set down a rule relieving an insurer from every statutory obligation once that insurer surrenders its certificate. The *Travelers* court noted that "[b]efore withdrawal is completed, the insurer must 'discharge its liabilities to residents of this State' . . . ." (*Travelers, supra,* 50 Cal.3d at p. 86, quoting § 1071.5.) In other words, "[a]fter applying, but before the actual withdrawal, the insurer is required to take action to assure that its obligations to California residents are discharged or protected." (50 Cal.3d at p. 109.) These proscriptions recognize that a withdrawing insurer cannot abruptly leave the state, but must phase out its business in an orderly fashion, consistent with the satisfaction of its existing obligations under applicable laws.

In considering what the law required in *Travelers,* the court observed that "language [in Proposition 103, itself] plainly implied that the mandatory renewal provision does not apply to insurers who employ the statutory procedure for withdrawing from the California insurance market." (*Travelers, supra,* 50 Cal.3d at pp. 93–94.) By contrast, the imposition of the statutory obligation to participate in the FAIR Plan's writings, expenses, profits and losses until an insurer has no direct written premiums in the second preceding year is not only rational and fair, but virtually required by the language of the FAIR Plan Act. That an insurer who enjoyed profitable operations during 1991 and 1992 could abandon entirely the remedial burdens imposed by the FAIR

Plan Act would destroy the symmetry of the legislative scheme by allowing the insurer to avoid its share of the obligations of participating in the FAIR Plan while enjoying the benefits.[17] It would also be inequitable, as any exemption for appellants from these obligations would simply transfer them to other insurers, increasing their financial burden. Comparably important public policy considerations simply did not exist in *Travelers*.

In conclusion, because appellants have failed to show any significant conflict between their right to cease doing business in the state and the fulfillment of their preexisting statutory obligations to the FAIR Plan, they have failed to show that they come within the holding of *Travelers*.

### D. The Interest Award

The trial court awarded interest on the outstanding assessments, finding "[f]ailure to award interest would unjustly enrich [appellants] by allowing them to benefit from their use of the funds that should have been paid, and unfairly burden other responsible insurers who timely paid their obligations pursuant to the FAIR Plan statute." Appellants do not challenge the awarding of interest; however, they do contend the trial court erred in granting interest at the rate of 10 percent per annum.[18]

■ The California Constitution provides that interest "shall be 7 percent per annum" unless the Legislature has specifically authorized a different rate. (Cal. Const., art. XV, § 1.) The parties seem to agree that the 10 percent rate applies only to breach of contractual obligations, and that the California Constitution's 7 percent annual rate of interest applies to breaches of statutory obligations. (See Civ. Code, § 3289, subd. (b); *Los Angeles National Bank v. Bank of Canton* (1995) 31 Cal.App.4th 726, 745–746 [37 Cal.Rptr.2d 389] [7 percent rate of interest applies to breaches of statutory obligations.].) This is an administrative mandamus action determining the parties' rights and obligations under the withdrawal statutes, FAIR Plan statutes, and statutorily required plan of operation. We agree with appellants that this case is not an action for breach of contract, and that the rate of interest should have been set at 7 percent.

---

[17] The statutory participation rule is the equitable counterweight to the two-year "waiting period" before a new member of the FAIR Plan Association participates in its affairs. Insurers first licensed and engaged in writing basic property insurance during a given year do not participate in the association's governance, expenses, profits or losses until the second pool year thereafter.

[18] The Commissioner's earlier decision concluded that the FAIR Plan was entitled to interest on the assessments "from the date payment was due." However, the Commissioner did not assert a rate of interest.

The parties next dispute on what date the interest became due. The trial court ordered interest be paid starting 30 days after the date of notice for each assessment.[19] Appellants argue that this was error and that interest did not begin to accrue until November 26, 1999, when the Commissioner's order upholding these assessments became effective. Appellants argue, "interest, if any, can accrue only from the time the assessments became due as a matter of law, and the Insurance Code mandates that any assessments thereunder become due when demanded by the Commissioner. Therefore, interest could accrue only from the date on which the Commissioner demanded payment—the effective date of his decision—and not 30 days after notice of the assessments, as the Court's Order provides."

In so arguing, appellants rely on section 12976, which provides, "All fines, forfeitures, taxes, assessments, and penalties provided for in this code *shall be due and payable on the demand of the commissioner.*" (Italics added.) However, we do not read this section as inferring that the Commissioner must approve each individual FAIR Plan assessment or that such an assessment *will not become due* until demanded by the Commissioner after protracted litigation. Equity should not allow the forfeiture of interest when appellants have steadfastly refused to pay their proportionate share of FAIR Plan expenses and losses until forced to do so by the Commissioner while other insurers have paid their proportionate share in a timely fashion without objection.

Thus, contrary to appellants' argument, the trial court correctly ruled that prejudgment interest should accrue from the date the assessments were due, not the date of the Commissioner's order directing petitioners to pay the assessments. "The law provides that for the breach of an obligation to pay money, in the absence of a contract provision for interest, interest shall be awarded from the time the money becomes due and payable. [Citations.]" (*Howard Townsite Owners, Inc. v. Mills* (1968) 268 Cal.App.2d 223, 230 [73 Cal.Rptr. 715].) Here, the assessment notices stated they were due and payable after the FAIR Plan provided notice of the assessments to appellants. (See *Maurice L. Bein, Inc. v. Housing Authority* (1958) 157 Cal.App.2d 670, 686 [321 P.2d 753] [plaintiff "supplied [defendant] with detailed statements of the data necessary to determine the amount due"; interest accrued from this time].) Therefore, we remand this matter to the trial court for a redetermination of the interest to be included as a part of the overall award.

---

[19] The record indicates payment of the first assessment was due December 2, 1993, 15 days after the November 17, 1993 notice thereof. Payment of the second assessment was due May 23, 1994 (May 21st was a Saturday), 30 days after the April 21, 1994 notice thereof.

# IV.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The matter is remanded to the superior court for recalculation of prejudgment interest at the rate of 7 percent, but otherwise is affirmed. Costs on appeal to respondents.

Kline, P. J., and Haerle, J., concurred.